UNITED STATES of America,
Plaintiff–Appellee,

v.

Carlos BOTERO–OSPINA,
Defendant–Appellant.

No. 94–4006.

United States Court of Appeals,
Tenth Circuit.

Dec. 5, 1995.

L.Ed.2d 699 (1989)) differs from that of the Seventh. *See Craig*, 907 F.2d at 658; *Kerner*, 895 F.2d at 1163.

R. Steven Chambers, Salt Lake City, Utah, for appellant.

Scott M. Matheson, Jr., United States Attorney (David J. Schwendiman, First Assistant U.S. Attorney, and Bruce C. Lubeck, Assistant U.S. Attorney, with him on the briefs), Salt Lake City, Utah, for appellee.

Before SEYMOUR, Chief Judge, MOORE, ANDERSON, TACHA, BALDOCK, BRORBY, EBEL, KELLY, HENRY, BRISCOE, and LUCERO, Circuit Judges.*

STEPHEN H. ANDERSON, Circuit Judge.

On our own motion we granted in banc review in this case to review that portion of the panel opinion in *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988), holding that the proper standard for determining whether a traffic stop is unconstitutionally pretextual is whether "under the same circumstances, a reasonable officer *would* have made the stop in the absence of the invalid purpose." *Id.* at 1517 (quoting *United States v. Smith*, 799 F.2d 704, 709 (11th Cir.1986)). For the reasons set forth below, we hold that the *Guzman* standard should be overruled and we adopt a new test in this circuit for determining when an initial stop of an automobile violates the Fourth Amendment.

## BACKGROUND

On March 9, 1993, Carlos Botero–Ospina was traveling eastbound on Interstate 70 just east of Salina, Utah. Deputy Phil Barney, of the Sevier County Sheriff's Department, was traveling westbound in his patrol car when he observed Mr. Botero–Ospina's vehicle swerve from the outside lane, straddle the center line, and swerve back to the outside lane. Deputy Barney testified at the suppression hearing that along this particular stretch of highway, midway between Los Angeles and Denver, drivers frequently experience fatigue. R. Vol. IV at 10–12. Thus, he decided to stop the vehicle to ensure that the driver was not falling asleep or driving under the influence of drugs or alcohol.[1]

Deputy Barney approached the vehicle and asked Mr. Botero–Ospina for his driver's licence and registration. The driver's license was that of Mr. Botero–Ospina, but the vehicle was registered in New Jersey to another man, Jamie Higuero. Mr. Botero–Ospina explained that he had recently purchased the

vehicle from a woman in California and that she had told him he could obtain the title from a bank in New Jersey. *Id.* at 17–19. Mr. Botero–Ospina, however, was unable to identify the woman or to explain her connection to the registered owner of the vehicle, Mr. Higuero.

In response to the deputy's question regarding where he had been, Mr. Botero–Ospina indicated that he had just come from "Garfield." Deputy Barney, however, knew from his experience that there was no such town along Mr. Botero–Ospina's route. Given the unusual nature of the encounter, Deputy Barney then asked Mr. Botero–Ospina if he had any weapons or drugs. Mr. Botero–Ospina answered that he did not. The deputy asked if he could search the vehicle, to which Mr. Botero–Ospina responded "sure." *Id.* at 19–21.

The search resulted in the seizure of 74 kilograms of cocaine from a secret compartment in the vehicle. Mr. Botero–Ospina moved to suppress the cocaine, arguing, *inter alia*, that the initial stop of his vehicle was pretextual, in violation of the Fourth Amendment. Following a suppression hearing, the district court adopted the recommendation of the magistrate judge and denied the motion. Following his conviction and sentencing, Mr. Botero–Ospina filed this appeal.

## DISCUSSION

### I.

In reviewing the denial of a motion to suppress, we accept the factual findings of the district court unless they are clearly erroneous. *United States v. McSwain*, 29 F.3d 558, 560 (10th Cir.1994). The ultimate determination of reasonableness under the Fourth Amendment, however, is a question of law which we review de novo. *United States v. Horn*, 970 F.2d 728, 730 (10th Cir.1992). We view the evidence on appeal in the light most favorable to the government. *United States v. Pena*, 920 F.2d 1509, 1513 (10th Cir.1990),

---

* Judge Murphy did not participate in this decision.

1. Deputy Barney's patrol car was equipped with a video camera which began recording when the deputy activated his emergency equipment. The video tape of the stop and ensuing search was admitted into evidence at the suppression hearing. R. Vol. IV at 13–15 (Ex. 1).

cert. denied, 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991).

■ A traffic stop is a seizure within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395–96, 59 L.Ed.2d 660 (1979). An ordinary traffic stop is, however, more analogous to an investigative detention than a custodial arrest. *United States v. Jones*, 44 F.3d 860, 871 (10th Cir.1995); *United States v. Walker*, 933 F.2d 812, 815 (10th Cir.1991), cert. denied, 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992). We therefore analyze such stops under the principles pertaining to investigative detentions set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See Walker*, 933 F.2d at 815. To determine the reasonableness of an investigative detention, we make a dual inquiry, asking first "whether the officer's action was justified at its inception," and second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879; *see McSwain*, 29 F.3d at 561; *United States v. Dewitt*, 946 F.2d 1497, 1501 (10th Cir.1991), cert. denied, 502 U.S. 1118, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992).

In *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988), we defined a pretextual traffic stop as one in which "the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop." *Id.* at 1515. We identified as the "classic example" of an unconstitutional pretext stop the case of an officer stopping a motorist for a minor traffic violation in order to investigate the officer's "hunch" that the individual is engaged in other illegal activity. Such a stop, we concluded, is not justified at its inception, and therefore violates the Fourth Amendment.

In *Guzman*, we adopted the following test to determine whether a stop is pretextual: " 'whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose.' " *Id.* (quoting *United States v. Smith*, 799 F.2d 704, 709 (11th Cir.1986)). This has become known as the "would" or the "usual police practices" standard. Time has proven the *Guzman* standard unworkable.

In our own circuit, its application has been inconsistent and sporadic. For example, while in *Guzman* we defined usual police practices in terms of the entire New Mexico police force, see *Guzman*, 864 F.2d at 1518, in *United States v. Fernandez*, 18 F.3d 874 (10th Cir.1994), we focused on the common practices of a particular unit of the Utah Highway Patrol. *Id.* at 877. In some cases we have specifically rejected an analysis which would consider the practices of an individual officer, *id.; see Guzman*, 864 F.2d at 1518, while in other cases we have focused exclusively on the practices of the individual officers. *See United States v. Harris*, 995 F.2d 1004, 1006 (10th Cir.1993); *see also United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir.1990). Additionally, since *Guzman*, we have only once, in *United States v. Lyons*, 7 F.3d 973, 975 (10th Cir.1993), relied on the "would" standard to reverse an order denying suppression.[2] In every other case, we have either implicitly or explicitly concluded that the stop was not pretextual based upon the officer's having observed a traffic violation or having had reasonable suspicion that a violation was occurring. *See, e.g., United States v. Dirden*, 38 F.3d 1131, 1140 (10th Cir.1994); *United States v. Betancur*, 24 F.3d 73, 77 (10th Cir.1994); *Harris*, 995 F.2d at 1005–06; *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir.1993); *Horn*, 970 F.2d at 731; *United States v. Deases*, 918 F.2d 118, 121 (10th Cir.1990), cert. denied, 501 U.S. 1233, 111 S.Ct. 2859, 115 L.Ed.2d 1026 (1991); *Werking*, 915 F.2d at 1408; *United States v. Corral*, 899 F.2d 991, 994 (10th Cir.1990); *United States v. Erwin*, 875 F.2d 268, 272 (10th Cir.1989).

**2.** Furthermore, in *Lyons*, the officer's inability to articulate *any* specific reason for pulling the defendant over—other than the officer's own "sixth sense"—made the stop unreasonable, and thus unconstitutional, under any standard. *Id.* at 976.

Moreover, the clear majority of other circuits considering the issue, as well as many state courts, including most within our circuit, have rejected the *Guzman* standard, either explicitly or implicitly. *See United States v. Johnson*, 63 F.3d 242, 247 (3d Cir. 1995); *United States v. Whren*, 53 F.3d 371, 375–76 (D.C.Cir.1995), *cert. granted*, — U.S. ——, 116 S.Ct. 690, — L.Ed.2d — (1996); *United States v. Scopo*, 19 F.3d 777, 782–84 (2d Cir.), *cert. denied*, — U.S. ——, 115 S.Ct. 207, 130 L.Ed.2d 136 (1994); *United States v. Ferguson*, 8 F.3d 385, 388–92 (6th Cir.1993), *cert. denied*, — U.S. ——, 115 S.Ct. 97, 130 L.Ed.2d 47 (1994); *United States v. Hassan El*, 5 F.3d 726, 729–31 (4th Cir.1993), *cert. denied*, — U.S. ——, 114 S.Ct. 1374, 128 L.Ed.2d 50 (1994); *United States v. Kelley*, 981 F.2d 1464, 1467 n. 3 (5th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 2427, 124 L.Ed.2d 647 (1993); *United States v. Cummins*, 920 F.2d 498, 500–01 (8th Cir. 1990), *cert. denied*, 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991); *United States v. Hope*, 906 F.2d 254, 257–58 (7th Cir.1990), *cert. denied*, 499 U.S. 983, 111 S.Ct. 1640, 113 L.Ed.2d 735 (1991); *State v. Corpany*, 859 P.2d 865, 870 (Colo.1993) (en banc); *Skelly v. State*, 880 P.2d 401, 404 (Okla.Crim.App.1994); *State v. Lopez*, 873 P.2d 1127, 1136–37 & n. 4 (Utah 1994); *Vrooman v. State*, 642 P.2d 782, 784 (Wyo.1982); *cf. United States v. Hadfield*, 918 F.2d 987, 993 (1st Cir.1990), *cert. denied*, 500 U.S. 936, 111 S.Ct. 2062, 114 L.Ed.2d 466 (1991). *But see United States v. Hernandez*, 55 F.3d 443, 445 (9th Cir.1995); *United States v. Harris*, 928 F.2d 1113, 1116–17 (11th Cir.1991).[3]

▮ Because the *Guzman* standard is unworkable, we now adopt a new standard in this circuit for examining the constitutionality of a traffic stop: a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.[4] It is irrelevant, for purposes of Fourth Amendment review, "whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop." *Ferguson*, 8 F.3d at 391. It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle. Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated "any one of the multitude of applicable traffic and equipment regulations" of the jurisdiction. *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979). To the extent that our decision in *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988), is inconsistent with this holding, it is overruled.

We adopt this new standard for several reasons, many of which have been discussed in other circuit court opinions rejecting our *Guzman* standard. *See Johnson*, 63 F.3d at 246–47; *Whren*, 53 F.3d at 375–76; *Ferguson*, 8 F.3d at 391–92. This new standard more effectively promotes an objective assessment of police officers' actions, as required by the Supreme Court. *See Maryland v. Macon*, 472 U.S. 463, 470, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370 (1985); *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). It eliminates the confusion and inconsistencies inher-

---

**3.** The Ninth Circuit's *Hernandez* opinion articulates the standard as follows: "[w]e focus on the objective facts and ask whether a reasonable officer, given the circumstances, would have made the stop absent a desire to investigate an unrelated serious offense. In making this inquiry, we often find it helpful to determine whether the stop conformed to regular police practices." *Hernandez*, 55 F.3d at 445 (citations omitted).

Of the six states within our circuit, it appears that New Mexico has not decided whether to adopt the *Guzman* standard. *See State v. Apodaca*, 112 N.M. 302, 304, 814 P.2d 1030, 1032 (Ct.App.1991) ("As in *State v. Benjamin C.*, 109 N.M. 67, 781 P.2d 795 (Ct.App.1989), we need

not decide whether to follow *Guzman*...."). There is some confusion, however, because in *State v. Wilson*, 116 N.M. 793, 867 P.2d 1175 (1994), in addressing whether a stop was pretextual, the New Mexico Supreme Court observed that "[t]he evidence was that [the] Deputy ... stopped six to eight vehicles a month for seat belt violations, and that he would not have stopped the car if there had been no seat belt violation." *Id.* at 787, 867 P.2d at 1179. That appears to be an application of the *Guzman* standard. We are aware of no Kansas cases addressing this issue.

**4.** We do not address in this standard an officer performing a community caretaking function.

ent in the application of the *Guzman* standard, and ensures that the validity of traffic stops "is not subject to the vagaries of police departments' policies and procedures concerning the kinds of traffic offenses of which they ordinarily do or do not take note." *Ferguson*, 8 F.3d at 392. Finally, and significantly, by abandoning the *Guzman* standard for pretext, we rightly leave to the state legislatures the task of determining what the traffic laws ought to be, and how those laws ought to be enforced.

## II.

■ It goes without saying that, by adopting the standard we do today, we do not abandon the traveling public to "the arbitrary exercise of discretionary police power." *Johnson*, 63 F.3d at 247. Our holding in this case properly focuses on the very narrow question of whether the initial stop of the vehicle is objectively justified. We leave intact the vast body of law which addresses the second prong of the *Terry* analysis—whether the police officer's actions are reasonably related in scope to the circumstances that justified the interference in the first place. Our well-developed case law clearly circumscribes the permissible scope of an investigative detention. *See United States v. Jones*, 44 F.3d 860, 871–72 (10th Cir.1995); *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir.1993); *United States v. Walker*, 933 F.2d 812, 816 (10th Cir.1991); *Guzman*, 864 F.2d at 1519; *see also Johnson*, 63 F.3d at 247. Therefore, if an officer's initial traffic stop, though objectively justified by the officer's observation of a minor traffic violation, is motivated by a desire to engage in an investigation of more serious criminal activity, his investigation nevertheless will be circumscribed by *Terry*'s scope requirement.

## III.

■ Applying the standard set forth in Part I of this opinion to the facts of this case, we cannot conclude that the district court erred in denying Mr. Botero–Ospina's suppression motion.

At the suppression hearing, Deputy Barney testified—and the magistrate judge's findings of fact reflect—that Mr. Botero–Ospina's vehicle was traveling well below the posted speed limit and straddling the lane as it traveled eastbound on Interstate 70. R. Vol. IV at 10. Additionally, Deputy Barney testified that, based upon his observation of the vehicle and his experience with motorists traveling down that stretch of road, he believed the driver may have been impaired or falling asleep. *Id.* at 12; R. Vol. II at 7. The magistrate judge found that Mr. Botero–Ospina's vehicle was generally being operated in violation of Utah law. R. Vol. I, Doc. 32 at 12.[5]

Under the standard adopted today, Deputy Barney's stop of Mr. Botero–Ospina's vehicle was proper. He observed a violation of Utah Code Ann. § 41–6–61 relating to lane straddling. Furthermore, he was able to articulate specific facts which, in light of his training and experience, gave rise to a reasonable suspicion that Mr. Botero–Ospina may have been driving under the influence of alcohol, in violation of Utah Code Ann. § 41–6–44. For either or both of these reasons, Deputy Barney was fully warranted in stopping Mr. Botero–Ospina. It is irrelevant whether a reasonable officer would have stopped Mr. Botero–Ospina under these circumstances. It is likewise irrelevant that Deputy Barney may have harbored a secret hope of finding evidence of drug trafficking. Because the deputy had reasonable articulable suspicion that a traffic violation had occurred or was occurring, the stop did not violate the Fourth Amendment and we need inquire no further into the circumstances surrounding the stop.

The other issues raised by Mr. Botero–Ospina in his appeal are not before the in banc court. We therefore return the case to the panel to address the remaining issues.

SEYMOUR, Chief Judge, with whom HENRY and LUCERO, Circuit Judges, join, dissenting.

The majority today upholds the validity of objectively unreasonable stops, and in so doing simply closes its eyes to Fourth Amend-

---

**5.** Straddling the lane is a violation of Utah law, *see* Utah Code Ann. § 41–6–61, as is driving under the influence of alcohol. *See* Utah Code Ann. § 41–6–44.

ment jurisprudence. To bolster its decision, the majority relies on reasons so logically or legally flawed as to be little more than self-serving rationalizations. Because I can accept neither the holding nor its support, I must respectfully dissent.

## I.

The majority concludes that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation." Maj. op. at 787. Under this standard it is irrelevant that a stop is rarely made, if ever, based on the particular violation. It is also irrelevant that the stop was motivated by racial animus, an inarticulable hunch, or any of the other improper reasons repeatedly condemned by the Supreme Court in the Fourth Amendment context. Although recognizing that the legality of a traffic stop must be analyzed under the balancing test set out in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the majority does not evaluate its standard under that test. When the majority's standard is assessed under *Terry,* it falls far short of satisfying "the central inquiry under the Fourth Amendment—the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Id.* at 19, 88 S.Ct. at 1878–79.

"The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order ' "to safeguard the privacy and security of individuals against arbitrary invasions." ' " *Delaware v. Prouse,* 440 U.S. 648, 653–54, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) (footnote omitted) (quoting *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978)). To assess the reasonableness of governmental conduct, the Court in *Terry* established a balancing test under which the need to stop or search must be weighed against the resulting intrusion upon constitutionally protected interests. *See Terry,* 392 U.S. at 20–21, 88 S.Ct. at 1879–80. The Court mandated examination of three factors, "the nature and extent of the governmental interests involved," *id.* at

22, 88 S.Ct. at 1880, "the nature and quality of the intrusion on individual rights," *id.* at 24, 88 S.Ct. at 1881, and "the reasonableness of [the] particular search or seizure in light of the particular circumstances", *id.* at 21, 88 S.Ct. at 1880.

I turn first to the nature of the governmental interests that the majority asserts are of sufficient significance to outweigh the resulting intrusion. We are here concerned with traffic laws that have resulted in a traffic stop on a particular occasion even though they otherwise would rarely, if ever, be enforced, especially on an interstate highway. A traffic ordinance so low in priority that it is not routinely enforced is not a particularly weighty governmental interest in the *Terry* balance. The majority points out that state legislatures should determine "what the traffic laws ought to be, and how those laws ought to be enforced." Maj. op. at 788. While I agree with that statement, it begs the question here. Although it is the legislature's prerogative to make the traffic laws, it is the police who enforce them and the police undeniably cannot and do not enforce all the laws all the time. We do not impinge upon the state's ability to articulate and enforce traffic laws by scrutinizing the inconsistent and arbitrary enforcement of those laws. Indeed, we routinely examine the enforcement of state laws implementing vital state interests when that enforcement is challenged as unconstitutional.

The second factor to be weighed in the *Terry* balance is the nature and quality of the intrusion on individual rights. The Supreme Court has made clear that although a traffic stop may be limited in purpose and brief in duration, it is nonetheless a "physical and psychological intrusion" of significance. *Delaware v. Prouse,* 440 U.S. at 657, 99 S.Ct. at 1398. A traffic stop "generally entail[s] law enforcement officers signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority. [It] interfere[s] with freedom of movement, [is] inconvenient, and consume[s] time. [It] may create substantial anxiety." *Id.*

"An individual operating or traveling in an automobile does not lose all reasonable

expectation of privacy simply because the automobile and its use are subject to government regulation. Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As *Terry v. Ohio, supra,* recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles."

*Id.* at 662–63, 99 S.Ct. at 1400–01 (footnote omitted).

In addition to producing the intrusion any individual experiences when subjected to a traffic stop, the majority's standard frees a police officer to target members of minority communities for the selective enforcement of otherwise unenforced statutes. The Supreme Court recognized in *Terry* that the harassment of minority groups by certain elements of the police population does occur, and that "the degree of community resentment aroused by particular practices is clearly relevant to an assessment of the quality of the intrusion upon reasonable expectations of personal security caused by those practices." *Terry,* 392 U.S. at 17 n. 14, 88 S.Ct. at 1877 n. 14. By refusing to examine either the arbitrariness with which a particular statute is enforced or the motivation underlying its enforcement in a particular case, the majority standard does nothing to curb the ugly reality that minority groups are sometimes targeted for selective enforcement. As a result, the majority standard adds the onus of discrimination and resentment to the already significant burden imposed by traffic stops generally.

The third element in the *Terry* balance is the justification for the particular intrusion. In *United States v. Guzman,* 864 F.2d 1512, 1517 (10th Cir.1988), this court held the relevant inquiry to be "whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose." The majority now rejects this standard and instead asks only whether the officer *could* have made the stop on the basis of an observed violation, even if a reasonable officer would not have done so under the circumstances absent an invalid purpose. In so doing, the majority simply ignores the plain language of binding Supreme Court authority.

The Supreme Court held in *Terry* that to justify a particular intrusion, a "police officer must be able to point to specific and articulable facts which, taken together with the rational inferences from those facts, *reasonably* warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1879–80 (emphasis added). It is difficult to justify a stop as reasonable, even if supported by an observed violation, if the undisputed facts indicate that the violation does not ordinarily result in a stop. Moreover, the Court in *Terry* described in detail the appropriate reasonableness inquiry in language that is utterly irreconcilable with the majority standard. The Court stated that in assessing the reasonableness of a particular stop *"it is imperative* that the facts be judged against an objective standard: *would* the facts available to the officer at the moment of the seizure or the search 'warrant *a man of reasonable caution* in the belief' that the action taken was appropriate?" *Id.* at 21–22, 88 S.Ct. at 1879–81 (emphasis added). It would hardly seem necessary to point out that the Court's mandate to determine what *a reasonable officer would do* in the circumstances cannot be fulfilled by merely ascertaining in a vacuum what *a particular officer could do* under state law.

Given the "multitude of applicable traffic and equipment regulations" in any jurisdiction, maj. op. at 787, upholding a stop on the basis of a regulation seldom enforced opens the door to the arbitrary exercise of police discretion condemned in *Terry* and its progeny. "Anything less [than the reasonable offi-

cer standard] would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880 (emphasis added). "This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." *Delaware v. Prouse*, 440 U.S. at 661, 99 S.Ct. at 1400. The majority standard, which allows virtually unfettered discretion by upholding a stop even if the underlying regulation is rarely enforced and even if motivated by an illegal purpose, simply cannot pass muster under Supreme Court authority. The *Guzman* standard, on the other hand, tracks the reasonable man standard set out in *Terry* virtually verbatim.

For this reason, one noted commentator is harshly critical of those courts that have adopted the majority standard, describing the cases as "poorly reasoned decisions" which "cannot be squared with the fundamental point that arbitrary action is unreasonable under the Fourth Amendment, as has been recognized by the Supreme Court in a variety of circumstances." 1 Wayne R. LaFave, *Search & Seizure* § 1.4(e), at 94 (2d ed. 1987 & 1995 pocket part). As Mr. LaFave points out, "[i]t is the *fact* of the departure from the accepted way of handling such cases which makes the officer's conduct arbitrary, and it is the arbitrariness which in this context constitutes the Fourth Amendment violation." *Id.*

> "[G]iven the pervasiveness of ... minor offenses and the ease with which law enforcement agents may uncover them in the conduct of virtually everyone ... there exists 'a power that places the liberty of every man in the hands of every petty officer,' precisely the kind of arbitrary authority which gave rise to the Fourth Amendment."

*Id.* at 95 (footnote omitted).

Application of the majority's "could" standard will promote cases as outrageous as

*United States v. Roberson*, 6 F.3d 1088 (5th Cir.1993). The facts there were as follows:

> "Shortly after midnight on Monday, October 14, 1991, Roberson, Keeper, and Whitlock were passengers in a minivan driven northbound by Darlene Linda McCleod on state highway 59 in Panola County, Texas. State Trooper Barry Washington, while pursuing a speeder, passed the van and *observed its out-of-state license plates and four black occupants*. Shortly thereafter Trooper Washington crested a hill, pulled onto the shoulder of the highway, doused his lights, and trained his radar gun on northbound traffic.
>
> As the van approached, the radar gun registered 58 miles per hour, three miles per hour above the speed limit. *The van, apparently the only moving vehicle on that stretch of road, changed lanes to distance itself as it passed the vehicle on the right shoulder. Trooper Washington noted that the lane change was unaccompanied by a signal and obviously regarded this as a serious traffic offense when committed by an out-of-state driver in Panola County.* He immediately gave chase and pulled the van over."

*Id.* at 1089 (emphasis added). The panel noted that "this court has become familiar with Trooper Washington's propensity for patrolling the fourth amendment's outer frontier," *id.* at 1092, but held that it was bound by Fifth Circuit precedent to uphold the stop.[1] Our court is now saying that all traffic stops meet the "reasonableness" requirement of the Fourth Amendment and *Terry* regardless of how insignificant the traffic violation and how ludicrous the notion that any reasonable officer would stop a vehicle on an interstate highway for *that* traffic violation. Our court is now saying that any archaic and unenforced traffic regulation justifies a stop regardless of how racially motivated and pretextual the stop is.

---

**1.** Our own Officer Barney has now patrolled far outside the outer boundaries of the Fourth Amendment. *See United States v. Boone*, 62 F.3d 323, 324, 326 (10th Cir.1995) (when driver of car drove off after illegal search, Officer Barney shot at the tires and then gave chase at speeds up to 100 miles per hour).

The majority standard not only abandons any meaningful effort to limit police discretion or to control pretext, it fails to even address the Supreme Court's concern with these problems. The Court has not directly evaluated pretextual stops under the Fourth Amendment, presumably because no case has asserted the argument that such stops are constitutional. Nonetheless, the Court has consistently suggested that the pretextual use of police power is constitutionally suspect. *See, e.g., New York v. Burger,* 482 U.S. 691, 716 n. 27, 107 S.Ct. 2636, 2651 n. 27, 96 L.Ed.2d 601 (1987) (in upholding administrative search, Court noted that neither statute nor search it authorized were pretext for obtaining evidence of penal violations); *Texas v. Brown* 460 U.S. 730, 743–44, 103 S.Ct. 1535, 1543–44, 75 L.Ed.2d 502 (1983) (in upholding seizure of evidence in plain view at roadblock stop, Court observed that roadblock was not pretext for invoking plain view doctrine); *Steagald v. United States,* 451 U.S. 204, 215, 101 S.Ct. 1642, 1649, 68 L.Ed.2d 38 (1981) (in holding that arrest warrant does not justify search of home, Court pointed out that arrest warrant may serve as pretext for entering home to search without probable cause); *Colorado v. Bannister,* 449 U.S. 1, 4 n. 4, 101 S.Ct. 42, 44 n. 4, 66 L.Ed.2d 1 (1980) (in upholding traffic stop, traffic citation, and subsequent arrest for theft, Court noted that issuing citation was not pretext for confirming suspicion of theft); *South Dakota v. Opperman,* 428 U.S. 364, 376, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000 (1976) (in upholding validity of inventory search pursuant to standard police procedures, Court observed that search was not pretext concealing investigatory motive).

The Court's care in noting the absence of pretext clearly indicates that pretext is significant and that its presence would affect the legality of an otherwise valid stop or a search. The majority standard, to the contrary, looks only at the ostensible justification for the intrusion and holds irrelevant factors that would indicate the presence of pretext. Under the majority standard, no stop can ever be pretextual by definition, while stops that are pretextual in fact are deemed lawful.

In sum, the majority standard promotes a government interest of very limited magnitude and permits intrusions upon Fourth Amendment interests that are not only significant but are additionally aggravated by the real possibility of discriminatory application. The majority validates these intrusions under a standard so devoid of meaningful content as to invest the police with the unbridled discretion condemned by the Supreme Court. The majority justifies this result by asserting that the reasonable officer standard is unworkable. The majority also contends that its standard more effectively promotes the objective assessment of police conduct and ensures that the validity of traffic stops does not vary on the basis of the violations particular police departments decide to emphasize. These reasons do not withstand even a cursory review.

Perhaps no concept is more firmly embedded in American jurisprudence than the reasonable person standard. Given its routine application by judges and juries in a myriad of contexts, I believe the majority is presumptuous in pronouncing it unworkable. In any event, we are not at liberty to reject the reasonable officer standard in view of the Supreme Court's clear directive that it be applied in this situation. The majority bolsters its conclusion by observing that we have rarely invalidated a stop as pretextual under the *Guzman* standard. However, the majority's observation equally supports the conclusion that *Guzman* does indeed work, that prosecutors have read and taken heed of that opinion, and that they have not pursued cases involving stops condemned by that case.[2]

In contending that its standard more effectively promotes an objective assessment of police conduct, the majority continues to turn a blind eye to the Supreme Court's directive in *Terry* that use of the reasonable officer standard is "imperative" in order to give meaning to the Fourth Amendment. *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1879–80. Indeed the cases which the majority cites rely

---

**2.** To the extent our prior opinions have inconsistently applied the *Guzman* standard, we should clarify the standard rather than abandon it altogether.

themselves upon the reasonable officer standard set out in *Terry*. *See Scott v. United States*, 436 U.S. 128, 137, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978) (quoting *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1879–80); *Maryland v. Macon*, 472 U.S. 463, 470, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370 (1985) (quoting *Scott* ).

Finally, the majority contends its standard ensures that the validity of traffic stops will not vary with the implementation policies of particular police departments. In virtually the same breath, however, the majority rightly points out that determining how traffic laws are to be enforced is a task for the states and not for the federal courts. We simply misperceive our responsibility when we mold our analysis to further state policy rather than to guarantee constitutional objectives. The validity of the enforcement of traffic stops must be measured not by the promotion of state interests but by the requirements of the Fourth Amendment as construed by the Supreme Court.

The Supreme Court did exactly that in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 holding a stop unconstitutional even while recognizing that the stop promoted a valid state interest. There the Court considered the constitutional validity of random traffic stops to check driver's licenses and car registrations. Significantly, the Court agreed that enforcing licensing and registration requirements is a vital state interest and assumed that the resulting detention would be both related to that interest and limited in nature. Nonetheless, the Court ruled such stops unconstitutional, concluding that "[t]he marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the roads to a seizure—limited in magnitude compared to other intrusions but nonetheless constitutionally cognizable—at the unbridled discretion of law enforcement officials." *Id.* at 661, 99 S.Ct. at 1400.

The facts at issue in *Delaware v. Prouse* are not significantly different from the scenario proposed by the majority here. In both cases the ostensible state purpose for the original stop is valid, although in both

cases the stop promotes that interest only marginally. In both cases the resulting detention would be brief and circumscribed by that legitimate interest. In both cases the police possess virtually unchecked discretion in selecting motorists to stop. The Court's ruling in *Delaware* that the " 'grave danger' of abuse of discretion" outweighed the other factors and rendered such stops unconstitutional would seem equally applicable here. *Id.* at 662, 99 S.Ct. at 1400–01.

Our mandate is clear.

"The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: *would* the facts available to the officer at the moment of the seizure or the search *"warrant a man of reasonable caution in the belief"* that the action taken was appropriate? "

*Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1880 (footnote omitted) (emphasis added). In refusing to apply the reasonable officer standard required by *Terry*, the majority rejects binding Supreme Court authority that we are not at liberty to disregard.

## II.

If the majority standard is to be the law in this circuit, it is imperative that we narrowly circumscribe and clearly define the scope of the detention that is permissible following a stop. I therefore take this opportunity to augment the majority's summary citation to our caselaw and to suggest limiting the breadth of some of our prior cases.

First, an officer conducting a traffic stop may detain the driver only so long as is necessary to request a driver's license and vehicle registration, run a computer check, and issue a citation. *See, e.g., United States v. Jones*, 44 F.3d 860, 872 (10th Cir.1995); *United States v. Walker*, 933 F.2d 812, 816 (10th Cir.1991). Questions unrelated to the

driver's traffic violation or to his right to operate the vehicle during this legitimate period of detention are only justified when the officer can support those questions by an objectively reasonable suspicion of other illegal activity. *Jones*, 44 F.3d at 872. In addition, detaining the driver beyond the time necessary to issue the citation, and/or questioning him during that extended detention likewise violates the Fourth Amendment absent reasonable suspicion. *Walker*, 933 F.2d at 816.

Second, our cases make clear that "[u]nless the officer has returned the driver's documentation, the driver is not free to go, and the encounter is not consensual." *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir.1993). So long as the officer retains the driver's license and registration, therefore, the officer cannot justify questions unrelated to the traffic stop as a consensual encounter. Such questions must be supported by an objectively reasonable suspicion of illegal activity. *See Walker*, 933 F.2d at 817.

We have permitted intrusive questioning absent reasonable suspicion once the driver's license and registration have been returned on the theory that because the driver is then "free to leave," the encounter is consensual. *See, e.g., United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir.1990). As we recognized in *Werking*, however, the line between a detention and a consensual encounter is not an easy one to draw. *Id.* at 1409. While a driver is as a matter of law free to leave once the officer has returned his documents, I am not persuaded that most drivers in reality understand that this act marks the end of their detention and the beginning of their right to go about their business, particularly when the return is immediately followed by questions about guns or drugs. Consequently, giving undue weight to the return of a driver's documents in ascertaining whether a subsequent encounter is consensual both ignores the real world and creates the substantial possibility that traffic stops will be used as fishing expeditions. Given this court's determination to permit pretextual stops of automobile travelers, it is especially important that we be vigilant at this second stage.

The Ohio Supreme Court has recently dealt with this problem by adopting a bright-line rule with respect to consensual encounters following traffic stops. *See State v. Robinette*, 73 Ohio St.3d 650, 653 N.E.2d 695 (1995). As the court recognized in *Robinette*,

"[m]ost people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him."

*Id.* 653 N.E.2d at 698. The Ohio Supreme Court was concerned that the blurred line between a legal detention and an attempted consensual encounter may be used to circumvent the clear rules courts have established to secure the protections of the Fourth Amendment.

"The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow."

*Id.* While recognizing that consensual encounters are an important and constitutional law enforcement tool, the court concluded that "[w]ithout a clear break from the detention, the succeeding encounter is not consensual at all." *Id.* 653 N.E.2d at 699. The court accordingly held that the required clear break does not occur until the detaining officer informs the driver that he is free to leave.

"[W]e are convinced that the right, guaranteed by the federal and Ohio Constitutions, to be secure in one's person and property requires that citizens stopped for traffic offenses be clearly informed by the detaining officer when they are free to go after a valid detention, before an officer attempts to engage in a consensual interrogation. Any attempt at consensual interrogation must be preceded by the phrase

"At this time you legally are free to go" or by words of similar import.

While the legality of consensual encounters between police and citizens should be preserved, we do not believe that this legality should be used by police officers to turn a routine traffic stop into a fishing expedition for unrelated criminal activity. The Fourth Amendment to the federal Constitution and Section 14, Article I of the Ohio Constitution exist to protect citizens against such an unreasonable interference with their liberty."

*Id.* 653 N.E.2d at 699.

Under federal constitutional jurisprudence, the voluntariness of consent "is to be determined by the totality of all the circumstances, and is a matter which the Government has the burden of proving." *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1878–79, 64 L.Ed.2d 497 (1980) (citation omitted). While I do not propose that we adopt the bright-line test in *Robinette,* the Supreme Court has made clear that knowledge of the right to refuse is "highly relevant" to the consent determination. *Mendenhall,* 446 U.S. at 559, 100 S.Ct. at 1879–80. I do not believe the Government can meet its burden under *Mendenhall* merely by showing that the officer returned the documents because, as *Robinette* discusses, we cannot infer from this act alone the critical fact that the driver understood its legal significance. To the extent that our cases can be read to hold that the return of documents is dispositive on the issue of a consensual encounter, *see, e.g., United States v. McKneely,* 6 F.3d 1447, 1451 (10th Cir. 1993). I believe we should disapprove them.

### III.

In closing, I must state that I am certain my learned colleagues do not lightly disregard controlling authority which in my view so clearly precludes the majority holding today. Nonetheless, the magnitude of the majority's deviation from Supreme Court precedent and the poverty of its reasons for doing so prompt me to observe that it is not for this court to provide law enforcement with a weapon in the war on drugs at the expense of the Fourth Amendment. A conviction won by eroding every individual's right to personal security is dearly bought indeed. In my judgment, we are perilously close to selling our birthright for bread and pottage. *See Genesis* 25:33–34. Accordingly, I respectfully dissent.

LUCERO, Circuit Judge, with whom SEYMOUR, Chief Judge, and HENRY, Circuit Judge, join, dissenting:

I join in the dissent of Chief Judge Seymour.

I take this opportunity to author these published remarks, my first since joining the court, to express my strong opposition to the rule which my colleagues in the majority announce today. I suggest an alternative approach.

The majority holds that in cases involving Fourth Amendment stops, federal trial courts may not inquire whether the initial traffic stop was a pretext. The pretext doctrine is expressly abandoned. Instead, the sole inquiry will be whether a traffic or equipment violation had occurred or there was a reasonable suspicion that one was occurring at the time of the stop. Further inquiry as to the reasonableness of the stop is deemed irrelevant. The message to law enforcement officers is clear: "You may stop motorists on a subterfuge; we don't care and we won't ask."[1]

I do not question the depth of the frustration which drives my colleagues in the majority to abandon the reasonable officer standard; nor do I doubt their sincerity in articulating the alternative path which they select. Nevertheless, their action will not stand the test of time, and it does not pass constitutional scrutiny today.

---

1. The consequence of such a message is also clear. An example of how innocent ordinary highway travellers have been stopped by profiling is described in *Whitfield v. Board of County Commissioners,* 837 F.Supp. 338, 340, 344 (D.Colo.1993). Under today's standard one driver—out of a string of hundreds of commuters hurrying home, each travelling three miles over the speed limit—could be stopped on the basis of constitutionally impermissible subjective motives. Inquiry about such subjective motives is branded irrelevant.

The right of the people to be free from unreasonable governmental intrusion into their lives has always been an aspirational goal of a free society. In America, freedom is not an allegory, it is a right. The Framers enacted the Fourth Amendment to protect against two particular devices by which the British crown had perpetrated widespread infringement on individual liberty. These devices—general warrants and writs of assistance—gave government officials power to find and shut down "libelous printers" and search colonists' homes for smuggled goods. *See* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 1.1(a) (2d. ed. 1987). They embodied " 'a power that places the liberty of every man in the hands of every petty officer.' " *Id.* § 1.4(e), at 95 (citation omitted). The Fourth Amendment was framed in response to this unacceptable governmental intrusion.

The Amendment does not prevent all searches and seizures; it prohibits *unreasonable* searches and seizures. It is intended to protect the innocent from unreasonable police conduct. We, the independent judiciary—as guardians of the Constitution—determine whether a seizure is reasonable. Reason is the conscience of the Fourth Amendment.

*Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) controls the judicial reasonableness inquiry. The language adopted by the Court today presents an express conflict with the language of *Terry.* What are the trial courts to do when faced with such an irreconcilable conflict?

I understand the desire of the majority to correct the perceived difficulties which require it to modify the *Guzman* standard, but that presents no basis for insulating the first step of *Terry* from any reasonableness inquiry whatsoever, save for asking whether an officer had a reasonable "articulable suspicion" that a traffic violation may be occurring. The policy arguments which are advanced in support of the majority's action are not an acceptable substitute for the clear language of the Fourth Amendment or of *Terry.*

I do not understand why the majority appears to have more confidence in the police than in the trial courts to make a comprehensive reasonableness analysis. If it is the use of the term "reasonable officer" that genuinely troubles the majority, then we should clarify the *Guzman* standard rather than abandon it altogether. We could align *Guzman* even more closely with *Terry* by adopting the *Terry* standard almost verbatim.

Under such an approach, the appropriate inquiry would be: Under the totality of the circumstances of any given stop, "would the facts available to the officer at the moment of the seizure *or* the search 'warrant a [person] of reasonable caution in the belief' that the action taken was appropriate?" *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1879–80 (emphasis added); *see also United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981) (*"the totality of the circumstances*—the whole picture must be taken into account") (emphasis added).

I have every confidence in the ability of the trial courts to determine whether Fourth Amendment-related traffic stops are reasonable under a totality of the circumstances test. I do not agree that merely asking whether an officer could have made a stop is an objective standard for reasonableness; rather I see it as a warrant for arbitrary exercise of police power.

Using the Constitution as our navigational chart, our duty as a court is to steer an independent course, staying clear of any pressures of the day. Because I perceive that my colleagues in the majority are pushing the tiller and steering us far away from our historical mission, I respectfully dissent. The rights of the people of this country as assured in the Bill of Rights have been achieved and maintained at a high cost. I would not dilute those rights by judicial fiat.