**UNITED STATES of America, Plaintiff,**

v.

**Murnia Reschell VERCHER, Jr., and Randall Derwin Terrell, Defendants.**

**No. 02–40154–01–JAR.**

United States District Court, D. Kansas.

March 10, 2003.

David J. Phillips, Melody J. Evans, Office of Federal Public Defender, Topeka, KS, for Murnia Reschell Vercher, Jr., defendant.

Michael M. Jackson, Topeka, KS, for Randall Derwin Terrell, defendant.

Thomas G. Luedke, Office of U.S. Atty., Topeka, KS, for U.S.

## MEMORANDUM ORDER GRANTING MOTION TO SUPPRESS

ROBINSON, District Judge.

Defendant Randall Terrell filed a motion to suppress any evidence derived from a stop and subsequent search of a minivan (Doc.28). Co-defendant Murnia Vercher joined in the motion to suppress (Doc. 27). Because the Government failed its burden of proving that the trooper had a reasonable articulable suspicion for the traffic stop, the Court grants the motion to suppress.

### Facts

On November 5, 2002, at approximately 7:55 a.m., Kansas Highway Patrol Trooper Rios was patrolling eastbound on Interstate 70 in Riley County, Kansas, when he came upon a minivan also traveling eastbound, in the right lane of I–70. It was an overcast, slightly foggy day. The temperature was about 32 to 33 and the road was mostly dry with some wet spots. It was not windy. Although Defendant Terrell testified that he is sure Trooper Rios saw him driving the minivan a few miles and a few minutes earlier, Rios testified that he did not notice the minivan until he was about three car lengths behind the minivan. Rios testified that at that point, he noticed that the minivan was about two car lengths or 20 to 25 feet behind the preceding vehicle, following too closely, a traffic violation. Rios testified that the minivan was driving about the same speed that he was, approximately 70 to 75 miles per hour; and that at that speed, a safe following distance would have been about 3–4 seconds or about 100 to 150 feet. Rios testified that at the time he spotted the violation, the vehicles were traveling uphill on a quarter mile incline. After spotting the violation, Rios pulled up beside the minivan, in order to identify the vehicle to call in its description to dispatch. He then pulled behind the minivan, activated his lights, which in turn activated the windshield mounted camera, and effected the traffic stop.

Terrell testified, and the government did not rebut, that he had been traveling in tandem with three other vehicles for some miles. Terrell was following a Kia, which he surmised had been using its cruise control, like Terrell was, because his minivan and the Kia had been traveling at a constant and consistent rate. A tractor trailer was following Terrell's minivan. At approximately mile marker 319, the terrain is quite hilly. Immediately before

Rios stopped the minivan, the road had gone sharply down hill and when Rios effected the stop, the road was going up-hill.

Terrell testified that as they had reached the bottom of the hill, he noticed that the Kia's brake lights came on. This happened just as Rios's car approached from behind in the left lane. Terrell testified that he touched his brakes too. At this point, the three vehicles drew closer together, but Terrell testified he was still a safe distance behind the Kia. On the other hand, Terrell testified, the tractor trailer had gained speed traveling down the hill, drawing closer to his minivan, in fact much closer than the minivan was to the Kia. Terrell testified that in light of these circumstances, he was maintaining a safe distance behind the Kia, while cognizant of the tractor trailer's distance behind him. As they climbed the hill, the tractor trailer lost speed, widening the distance between it and the minivan. Rios then pulled between the minivan and the tractor trailer.

Rios testified that he did not recall a tractor trailer behind the minivan; however, the videotape of the stop reveals that a tractor trailer passed by Terrell and Rios's vehicles within seconds after Rios and Terrell pulled onto the right shoulder, corroborating Terrell's testimony that the tractor trailer had been following him.

After effecting the traffic stop and obtaining Terrell's driver license and the rental papers on the minivan, Rios determined that neither Terrell nor his sole passenger, defendant Vercher, were authorized to drive the minivan. After conferring with the rental company, Rios had the minivan towed and impounded. In inventorying the vehicle, officers discovered that the seals of two interior door panels in the

front compartment of the minivan had been tampered with. The panels came off easily, and officers recovered a 2.5 pound package of cocaine from both the right and left panel areas, for a total of about 5 pounds of cocaine. Both defendants denied knowledge of the packages.

### Analysis

The defendants move to suppress on the basis that Trooper Rios lacked reasonable suspicion or probable cause that a traffic violation, following too closely, was occurring or had occurred. The defendants also contend that the stop was pretextual in that Rios stopped their vehicle because they are black. Terrell and Rios testified that earlier, on the day of the suppression hearing, they had seen and greeted each other at a rest stop about 50 miles west of Topeka, along Interstate 70. Terrell, and presumably Rios, were en route to court. Shortly thereafter, as Terrell and his wife continued their drive to Topeka on Interstate 70, Terrell's vehicle was stopped by three law enforcement vehicles: a highway patrol van and two black and white police cars. Rios was not present during this second stop, and denied that he had alerted officers to stop Terrell's vehicle that day. Whether or not this evidence serves to establish that Rios's prior stop of Terrell's vehicle was based on improper motives is inapposite. In *United States v. BoteroOspina*,[1] the Tenth Circuit held that an officer's subjective motives for stopping a vehicle are irrelevant.

 A traffic stop is valid under the Fourth Amendment if the officer has observed a traffic violation, or if the officer has a "reasonable articulable suspicion" that a traffic violation has occurred or is occurring.[2] Following another vehicle too

---

**1.** 71 F.3d 783, 787 (10th Cir.1995) (quoting *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir.1993), cert. denied, 513 U.S. 828, 115 S.Ct. 97, 130 L.Ed.2d 47 (1994)).

**2.** *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (Traffic stop valid "where the police have probable cause to believe that a traffic violation has

closely is a traffic offense in Kansas. K.S.A. § 8–1522(a) states that:

> The driver of a motor vehicle shall not follow another vehicle more closely than is **reasonable and prudent**, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway. (emphasis added).

Following too closely is a traffic violation under the laws of Kansas, and like any other traffic violation, can be a legitimate basis for officers to effectuate a traffic stop. In fact, the officer need only have a reasonable articulable suspicion of the violation.

Trooper Rios articulates that he suspected that Terrell's minivan was following the preceding vehicle too closely. While driving in the left lane, Rios approached the minivan from behind, and when he was about three car lengths behind, Rios observed that the minivan was about 20 to 25 feet behind the Kia, too close. Given the speed of the vehicles, there should have been 100 to 150 feet between the vehicles, or 3 to 4 seconds between them.

If following too closely was per se a violation of K.S.A. § 8–1522, Rios's testimony might be sufficient to satisfy the "reasonable articulable suspicion" standard for traffic stops. But, this statute precludes such an absolute rule, for it is subject to an evaluation of whether it was reasonable and prudent for the vehicle to be following another vehicle at that particular distance. The statute itself suggests that the speed of the vehicles, the traffic and the road condition may be material to the evaluation of reasonable prudence. Unlike traffic statutes that define absolute violations, this statute requires that the officer perform some evaluation of whether the potential violation occurred. And, the government bears the burden of showing that the officer had probable cause or reasonable suspicion based on his observation and evaluation.

Rios testified that the vehicles were going about 70 to 75 m.p.h., and that a safe distance would have been 100 to 150 feet, not the 20 to 25 feet that he observed. The speed of the vehicles is surely relevant to an analysis of reasonable prudence. Rios also testified that it was a slightly foggy, overcast day. But these facts are not particularly relevant in this case. Poor weather conditions, slick or icy roads are relevant to an evaluation of reasonable prudence, for such conditions weigh in favor of a person maintaining a greater distance behind the preceding car. But in this case, the unremarkable weather and road conditions added nothing to an evaluation of reasonable prudence. Other circumstances that had far more relevance, were not considered by Rios.

Rios did not testify to, and thus apparently did not consider the traffic conditions. Rios did not recall the tractor trailer behind Terrell, although the videotape corroborates that the tractor trailer was behind Terrell. Rios did not notice whether or not the Kia was braking. Rios did not notice whether the cars and truck bunched up at the bottom of the hill. His observation was a snapshot taken as the vehicles were beginning to go uphill but while Terrell was still relatively close behind the Kia. Because Rios did not notice or consider the traffic conditions, he could not make an evaluation of whether Terrell's distance, although close given the speed of the vehicles, was nevertheless reasonable and prudent given the relevant circumstances.

The reasonable articulable suspicion standard requires more than what Rios

occurred."); *U.S. v. Hunnicutt,* 135 F.3d 1345, 1348 (10th Cir.1998) (citing *United States v. Botero-Ospina,* 71 F.3d 783, 787 (10th Cir.1995)) (reasonable articulable suspicion of traffic violation is valid basis for traffic stop).

offers—a one look, snapshot observation that the vehicles were traveling too closely, without regard to any other relevant circumstances. In contrast to the abbreviated testimony of Rios, Terrell testified that he was in a pack of three vehicles, that had been traveling at safe intervals, but as they went downhill, the Kia braked, about the time that Rios's patrol car neared them from behind. This caused Terrell to brake, while drawing closer to the Kia; and the tractor trailer to draw even closer to Terrell. The vehicles then immediately started uphill. Rios made his snapshot observation at that time, apparently.

The government presented no evidence to rebut Terrell's testimony that although he drew closer to the Kia, he maintained a safe following distance given these circumstances: they had just gone downhill; the tractor trailer was bearing down on him; and he could not change into the left lane, because Rios was in that lane. Rios offered no testimony that Terrell had followed the Kia too closely over some period of time or over some distance, however short.

This Court's determination that the officer must be able to perceive and articulate a basis for reasonable suspicion that the driver's conduct was not reasonable and prudent, is not unprecedented in the judicial evaluation of the legitimacy of traffic stops in this Circuit. For traffic statutes that create violations for driving conduct that lacks practicability, cause or reasonable prudence, courts have required more than quick glance or observation devoid of consideration of any other relevant circumstances. A number of Tenth Circuit decisions address the legitimacy of traffic stops for violations of "single lane" statutes, which like the statute in this case do not establish a per se violation. Rather,

these statutes require one to drive in a single lane, and not stray from that lane, to the extent practicable.

The Tenth Circuit has had occasion to consider the parameters of the Utah and Kansas single lane statutes, which are nearly identical. The Utah statute requires that vehicles be operated "as nearly as practical entirely within a single lane"[3] and the Kansas statute requires that vehicles be operated "an nearly as practicable entirely within a single lane."[4]

Because these single lane statutes do not establish a per se or absolute violation, courts evaluate reasonable suspicion or probable cause with an objective, fact-specific inquiry. As the Tenth Circuit noted in *BoteroOspina*,[5] the court considers whether the "historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause."

Thus, the Tenth Circuit has declined to find reasonable suspicion or probable cause solely on the basis of a single incidence of straying from a driving lane. The government must present evidence of other material facts and circumstances. The purpose of the single lane statutes frames what other facts or circumstances are material. These single lane statutes are designed to address erratic driving, which may be symptomatic of fatigue or impairment. Thus, in determining whether there is reasonable suspicion for a single lane violation, the officer must consider whether the driver's straying from the lane was an aberration, or caused by external factors. If so, then there may be no reasonable suspicion of a violation. On the other hand, where the facts and circumstances evidence that the straying was no aberration, or that external factors did not

---

3. Utah Code Ann. § 41–6–61(1).

4. K.S.A. § 8–1522 (1991).

5. 71 F.3d at 787.

cause the straying, there may be reasonable suspicion of a violation.

In *United States v. Gregory,*[6] the Tenth Circuit held that one incidence of a U-Haul truck straying onto the shoulder of the road did not establish probable cause or reasonable suspicion that the Utah single lane statute had been violated, because the road was winding, the terrain mountainous, and the weather windy. Thus,

> Under these conditions any vehicle could be subject to an isolated incident of moving into the right shoulder of the roadway, without giving rise to a suspicion of criminal activity. The driver may have decided to pull over to check his vehicle and then have a sudden change of mind and pulled back into the traffic lane. Since the movement of the vehicle occurred toward the right shoulder, other traffic was in no danger of collision.

But, in *United States v. Dunn,*[7] a stop based on single incidence of a sedan straying onto the shoulder, was valid, where the road was straight and slightly graded, and it was not windy. In other words, there was no apparent reason for the car straying from its driving lane.

When the officer observes a vehicle straying from the lane more than once, over a period of time or distance, the need to consider other facts is not as great, for repeated straying is stronger evidence that the driver's straying from the lane is not due to external circumstances, and that staying in the lane was not impracticable. Thus, in *United States v. Ozbirn,*[8] the Tenth Circuit held a stop valid when the trooper had observed the vehicle twice drifting onto the shoulder of the road within a quarter mile stretch, at a time when there were optimal road, weather, and traffic conditions, that did make staying in one lane impracticable.[9] In *U.S. v. Parker,*[10] the stop was valid where the trooper observed the car drift twice into the emergency lane for approximately 200 feet. In *U.S. v. Phillips*[11] the stop was valid when the vehicle twice crossed the line and was also traveling at an exceptionally slow speed. And, in *United States v. Botero-Ospina,*[12] the stop was valid where the officer observed the car "swerve from the outside lane, straddle the center line, and swerve back to the outside lane." In each instance, the officer's observations of repeated straying supported a reasonable suspicion that it was not impracticable for the car to have stayed in one lane.

Like the single lane statutes, Kansas's following too closely statute is not absolute. It requires that a vehicle not follow another too closely, unless reasonable and prudent. This statute also requires an objective, fact-specific inquiry by the court. And, the plain language, as well as the

---

**6.** 79 F.3d 973, 977 (10th Cir.1996) (analyzing Utah Code Ann. § 41-6-61(1) which requires that vehicles "operate as nearly as practical entirely within a single lane"); *See also United States v. Ochoa,* 4 F.Supp.2d 1007, 1011-12 (D.Kan.1998) (traffic stop was not justified because the vehicle had strayed onto the shoulder only once, there was no evidence concerning the weather, inconsistent evidence concerning the road conditions, as well as evidence that the positioning of the trooper's car may have caused the driver to stray onto the shoulder).

**7.** 133 F.3d 933 (10th Cir.1998) (analyzing K.S.A. § 8-1522 which requires that a vehicle be driven "as nearly as practicable entirely within a single lane").

**8.** 189 F.3d 1194, 1198 (10th Cir.1999).

**9.** *Id.*

**10.** 72 F.3d 1444 (10th Cir.1995).

**11.** 1 Fed. Appx. 847, 849 (10th Cir.2001).

**12.** 71 F.3d 783, 785 (10th Cir.1995) (en banc), *cert. denied,* 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996).

purpose of the statute frame what facts and circumstances are material to a determination of whether the driver acted with reasonable prudence. The statute suggests that road and traffic conditions are material to this determination. A quick observation that a vehicle is closely following another simply does not suffice. The officer needs to observe enough to evaluate whether there are external factors causing the vehicle to follow the other too closely, or whether there are external factors impeding the vehicle from maintaining a longer distance at that time. Material circumstances might include that the vehicle was following another for some period of time or distance, and without any impediment to maintaining a safer distance.

On the other hand, if circumstances show that the vehicle is in the process of using the cushion of distance in front of it to slow or stop behind the preceding vehicle which is itself slowing or stopping, there is no reasonable suspicion of a violation. After all, the purpose of this statute is to ensure that drivers maintain a safe distance, so that in the event of an exigency, they will be able to slow or stop, as needed, without hitting the car in front of them. As the Kansas Supreme Court has noted, this well established rule does not apply to a situation "...where a sudden emergency arises, as by the sudden application of brakes and sudden stop without warning of another vehicle just ahead."[13] Indeed, in such an instance, one would expect the car to be following too closely, using the cushion of distance to slow or stop without striking the vehicle.

 The evidence, unrebuked by the government, is that Terrell was using the distance between the minivan and the Kia to slow down, without colliding, when these circumstances arose. After going downhill, the Kia braked, necessitating Terrell's braking, but the tractor trailer behind Terrell was bearing down on Terrell. As the vehicles then went uphill, Terrell's distance between the Kia, although still close, was safe. Terrell could not safely slow much more without risking being hit by the tractor trailer behind. His other option, by the time they were starting uphill, and at the time Rios spotted the alleged violation, was to change lanes, but that would not have been prudent, since Rios was in that lane. Given these circumstances, the government has not proved that Rios had reasonable suspicion or probable cause that Terrell was following the Kia "more closely than is reasonable and prudent."

**IT IS THEREFORE BY THE COURT ORDERED** that the defendants' Motion for Suppress (Doc. 28) is granted.

---

**13.** *Hill v. Hill,* 168 Kan. 639, 215 P.2d 159, 161 (1950).