**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Michael LYONS, Defendant–Appellant.**

**No. 93–4079.**

United States Court of Appeals, Tenth Circuit.

Nov. 2, 1993.

Ronald J. Yengich of Yengich, Rich & Xaiz, Salt Lake City, UT, for defendant-appellant.

Kevin L. Sundwall, Sp. Asst. U.S. Atty. (Richard D. Parry, U.S. Atty., and David J. Schwendiman, Asst. U.S. Atty., with him on the briefs), Salt Lake City, UT, for plaintiff-appellee.

JOHN P. MOORE, Circuit Judge.

Michael Lyons entered a conditional plea of guilty to a charge of possession of marijuana with intent to distribute. He appeals on issues related to the seizure of the substance which led to the conviction. The only matter we consider is whether the finding of the magistrate judge, subsequently adopted by the district court, that the stop of defendant's truck was not pretextual is erroneous. Concluding that it is, we reverse and remand.

While on routine patrol with another officer on I–15 in Juab County, Utah, Sergeant Paul Mangelson of the Utah Highway Patrol was attracted to a pickup truck "by the way this vehicle was being operated on the road." Following the truck for approximately two miles, Sergeant Mangelson saw it "weave" three to four times within its lane of the divided highway. The two lanes in the truck's direction of travel were sixteen to eighteen feet wide, and during the period of Mangelson's observation the truck remained within its own lane.

Recalling that some drivers on this stretch of road came from gambling in Las Vegas or Mesquite, Nevada, where they had been drinking or had gone without sleep, Mangelson decided to investigate further. Pulling alongside the truck, he looked at the driver, who was later identified as defendant Michael Lyons. Mangelson noted Mr. Lyons "had a look about him that appeared to me to be a person that was impaired. He had a withdrawn look to him." The officer arrived at this conclusion because "he would not make eye contact with us." To Mangelson this failure "substantiated what we already suspected that the driver may be impaired." Mangelson added, "[i]t is hard to describe a person that is under the influence, but a police officer that has been a police officer for a number of years can look at a person and he can basically tell a person that is impaired or under the influence." Because he thought Mr. Lyons "might be impaired," he turned on his emergency signal and pulled the truck to the side of the road.

Mangelson walked to the driver's window and asked defendant for his license and the registration of the vehicle. Mr. Lyons produced his license but told Mangelson the truck belonged to defendant's passenger, Robert Langworthy. In response to Mangelson's inquiry, Mr. Langworthy said the registration was in the back of the truck. While following Mr. Langworthy to the back of the truck, Mangelson noticed the "odor of marijuana was about the vehicle." When Langworthy dropped the tailgate to retrieve the vehicle registration, Mangelson saw a "plywood partition" behind which he eventually found about forty-three pounds of marijuana.

After initially obtaining defendant's driver's license, however, Mangelson did nothing to determine whether Mr. Lyons was impaired. He asked no questions about drinking or lack of sleep; administered no roadside sobriety tests; did not request the defendant submit to blood, breath, or urine tests; and issued no citation for driving while impaired. Moreover, he noticed no smell of alcohol on defendant's breath and observed nothing about his person indicating he was impaired in any way. Mangelson explained he did none of these things because the situation "went from a suspected DUI to a second degree felony. So there was no need to pursue that."

During a hearing to suppress the marijuana, Mangelson made several pertinent admissions on cross-examination. He acknowledged in his experience "entirely innocent" drivers would react to the presence of a police car by "keeping their eyes on the road." He recognized that doing so was not unusual. He agreed "very few" people drive on the interstate without "some weaving" in their lane of traffic and admitted that defendant's "weaving" violated no Utah law. He also conceded that he was unable to articulate any specific reason for believing defendant was impaired and merely relied upon his "sixth sense as an experienced highway patrolman." When pressed, however, Mangelson contended the fact that persuaded him was the defendant's refusal to "make eye contact with us."

Mangelson said this unwillingness to look at the officers was "like a kid that has, for example, stolen a cookie out of the cookie jar and you come home and you know the cookies are gone and you know he took them but he won't look at you." Nonetheless, Mangelson admitted Mr. Lyons' demeanor would have been no different had he been "in deep thought."

On the basis of this evidence, the magistrate judge recommended the district court conclude the stop was not pretextual. In making this recommendation, the magistrate judge relied heavily upon Mangelson's twenty-six years' experience which, the magistrate judge concluded, enabled Mangelson to determine the weaving and defendant's failure to make eye contact meant he was impaired. The district court adopted the recommendation, and this appeal was taken following the entry of a conditional plea of guilty.

When reviewing the denial of a motion to suppress, we accept the district court's findings of fact unless they are clearly erroneous. *United States v. Morales–Zamora*, 974 F.2d 149, 151 (10th Cir.1992). The ultimate determination of reasonableness under the Fourth Amendment is a conclusion of law which we review *de novo*. *Id.*

Although the defendant's version of the events pertaining to the question of pretext differs from that of Sergeant Mangelson, we cannot conclude the findings of the magistrate judge are clearly erroneous. We nonetheless take issue with the district court's application of those facts to the ultimate question.

"A pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place ... for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop." *United States v. Guzman*, 864 F.2d 1512, 1515 (10th Cir.1988). The issue we must resolve initially, then, is whether the primary reason for Mangelson's stop was to determine whether the defendant was driving while impaired by alcohol or lack of sleep. *Morales–Zamora*, 974 F.2d at 152. If the evidence supports such a reason, the stop cannot have been pretextual because it would have been grounded upon the officer's duty to protect the driving public from the danger of an impaired motorist.

That resolution, however, is based upon objective analysis and not an inquiry into the officer's subjective intent. *Guzman*, 864 F.2d at 1515. The analysis asks whether, under the facts presented, a reasonable officer would have made the stop in the absence of the invalid purpose. *Id.* at 1517. That the officer could have stopped the defendant for driving while impaired is not determinative, nor is the officer's actual subjective intent relevant. *Id.* (*citing United States v. Smith*, 799 F.2d 704, 710 (11th Cir.1986)).

**976**

After reviewing the record with these principles in mind, we believe the district court accepted and was guided by Sergeant Mangelson's subjective claim the defendant was impaired. Yet, Mangelson admitted on cross-examination he could not articulate a reason for that claim but relied instead upon his "sixth sense." Such reliance is not the stuff of objective reasonability. It is merely the manifestation of a hunch that something foul is afoot.[1]

We also believe Mangelson's admissions concerning the universality of drivers' "weaving" in their lanes and the commonness of people's avoiding eye contact with police officers while driving significantly undercut the rationality of using these factors as objective reasons for the legitimacy of the stop. Indeed, if failure to follow a perfect vector down the highway or keeping one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy.

Mangelson's failure to initiate any effort to determine the defendant's state of sobriety after effecting the stop is equally telling. He expanded the scope of his inquiry without making any of the normal observations that are employed to determine impairment. This failure calls into serious question the real motive for the stop. When coupled with other peculiar aspects of his testimony, such as how he could tell defendant had a "withdrawn look" when he could not see his eyes, we do not believe a reasonable officer would have found sufficient grounds to effect a stop. This circumstance suggests the motivation for the stop was something other than Mr. Lyons' ability to drive.

Contrary to the magistrate judge's conclusion, this case is indistinguishable from and controlled by *Guzman*. The stop was pretextual and the seizure that followed was tainted and should have been suppressed. *Morales–Zamora*, 974 F.2d at 153.

The judgment of the district court is **REVERSED**. The cause is **REMANDED** for further proceedings.

---

1. Additionally, the magistrate judge noted: "After the vehicle was stopped the smell of marijuana supported the officer's belief that Lyons was intoxicated." The testimony, however, was that the smell came from the truck, not the defendant. The difference makes the testimony no more illuminative of the defendant's driving ability than any of the other reasons Mangelson relied upon to effect the stop. Moreover, although the testimony about when he first detected the smell is confused, Mangelson first stated he did not detect the odor until after the passenger got out of the truck to find the vehicle registration. By that time, the seizure of the truck and its occupants had been made.