# COURT OF APPEALS OF VIRGINIA

**Record No. 1577-25-3**

ROBERT L. MCCUMBER
v.
COMMONWEALTH OF VIRGINIA

Present: Judges Causey, Raphael and Duffan

Argued at Lexington, Virginia

Opinion Issued June 23, 2026

## FROM THE CIRCUIT COURT OF ROCKBRIDGE COUNTY
Christopher B. Russell, Judge

Tiffany J. Fix (Simons, Thurman & Fix, P.C., on brief), for appellant.

Allison M. Mentch, Assistant Attorney General (Jay Jones, Attorney General, on brief), for appellee.

## PUBLISHED OPINION BY
## <u>JUDGE STUART A. RAPHAEL</u>

Robert L. McCumber appeals his conviction for driving while intoxicated in violation of Code § 18.2-266, arguing that the trial court erred in denying his Fourth Amendment suppression motion. A sheriff's deputy detained McCumber after observing him driving at night without his taillights illuminated, five miles below the posted speed limit, and weaving twice within the lane. McCumber argues that two weaves were too few to create reasonable suspicion that he was driving drunk. He also argues that the violation of the taillight-illumination requirement in Code § 46.2-1030 invalidated the stop because subsection F of that statute provides that "[n]o law-enforcement officer shall stop a motor vehicle for a violation of this section."

Rejecting McCumber's statutory argument and finding that a reasonable officer considering the totality of circumstances could reasonably suspect that McCumber was driving

while intoxicated, we find no error by the trial court in denying McCumber's suppression motion. So we affirm his conviction.

BACKGROUND

We recite the facts in the light most favorable to the Commonwealth, the prevailing party below. *Camann v. Commonwealth*, 79 Va. App. 427, 431 (2024) (en banc). "Doing so requires that we 'discard' the defendant's evidence when it conflicts with the Commonwealth's evidence, 'regard as true all the credible evidence favorable to the Commonwealth,' and read 'all fair inferences' in the Commonwealth's favor." *Id.* (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

At about 9:00 p.m. on December 9, 2024, Lieutenant Chris Young of the Rockbridge County Sheriff's Office followed a truck driven by McCumber. McCumber was driving below the speed limit and weaved twice within the travel lane. His truck would drift to the edge of the roadway, then "abruptly jerk back to the left." McCumber's taillights were not illuminated. Young activated his emergency equipment and pulled over the truck. When Young approached McCumber to speak with him, he smelled alcohol on McCumber's breath. McCumber first said he had consumed one beer but later admitted to having two "tall" beers. After McCumber failed a field-sobriety test, Young arrested him for driving while intoxicated. Testing showed McCumber's blood-alcohol level to be 0.12%.

McCumber moved to suppress the evidence on the ground that he was detained in violation of the Fourth Amendment. He argued that a law-enforcement officer may stop a vehicle for not having the taillights illuminated only "if the officer has reasonable suspicion to stop the vehicle for other valid causes." McCumber also argued that weaving twice within the travel lane and driving below the speed limit did not provide reasonable suspicion for an investigatory detention.

Young testified at the suppression hearing that he had conducted "a couple hundred" traffic stops during his 11-year career. He said that McCumber's in-lane weaving and slower driving at night concerned him. McCumber's truck would slowly "drift to the right" and then make "an abrupt movement back to the left, back towards the center lane." Young characterized the movements as "two swervings." Young estimated that the truck was traveling 30 miles per hour in a 35 mile-per-hour zone. While the truck's brake lights were working, the truck's taillights were not illuminated. The record does not reveal whether the headlights were illuminated.

When asked why he stopped McCumber, Young said: "It was the culmination of the driving behaviors, the two drifts to the right, abrupt jerking back to the left, the no illumination of taillights as well as the thirty in a thirty-five, it was all of that combined to give me reasons, suspicion to make a traffic stop." When asked what crime he reasonably suspected was being committed, Young answered, "Driving under the influence of drugs or alcohol."

After taking the suppression motion under advisement, the trial court issued an order denying the motion without explaining its reasoning. McCumber entered a conditional guilty plea to driving while intoxicated and preserved his appeal rights to contest the suppression ruling. McCumber was sentenced to 60 days' incarceration, all suspended, and one year of probation. The court also suspended McCumber's license for a year and ordered him to complete an alcohol-safety program. McCumber appeals.

ANALYSIS

McCumber claims that the trial court erred in denying his suppression motion, arguing that the traffic stop violated his Fourth Amendment rights because Young lacked reasonable suspicion to pull him over. McCumber also claims that the stop was tainted by the fact that Young stopped him in part because his taillights were not illuminated. He reasons that the

- 3 -

sunset-to-sunrise illumination requirement in subsection (A)(i) of Code § 46.2-1030 applies to taillights, and that subsection F renders evidence inadmissible that was obtained as a result "of a stop in violation of this subsection."

*A. Reasonable suspicion supported the traffic stop.*

Whether "evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact that we review de novo on appeal." *Brooks v. Commonwealth*, 282 Va. 90, 94 (2011) (quoting *Jones v. Commonwealth*, 277 Va. 171, 177 (2009)); *United States v. Arvizu*, 534 U.S. 266, 275 (2002) ("[T]he standard for appellate review of reasonable-suspicion determinations should be *de novo*, rather than for 'abuse of discretion.'" (quoting *Ornelas v. United States*, 517 U.S. 690, 691 (1996))). In other words, "'determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal[,]' while findings of historical fact are reviewed for clear error." *Brooks*, 282 Va. at 95 (quoting *Ornelas*, 517 U.S. at 699).

"[T]he Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). A "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Glover*, 589 U.S. at 380 (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)). "Reasonable suspicion 'depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians,

- 4 -

act.'" *District of Columbia v. R.W.*, 146 S. Ct. 1069, 1071 (2026) (per curiam) (quoting *Glover*, 589 U.S. 376, 380 (2020)). "It permits officers to make 'commonsense judgments and inferences about human behavior.'" *Id.* (quoting *Glover*, 589 U.S. at 380-81).

"In assessing whether an officer had reasonable suspicion, a reviewing court must 'look at the "totality of the circumstances" of each case'—an analysis that precludes the 'evaluation and rejection' of 'factors in isolation from each other.'" *Id.* at 1070 (quoting *Arvizu*, 534 U.S. at 273-74). Because "the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation," *District of Columbia v. Wesby*, 583 U.S. 48, 60-61 (2018), courts may not "excis[e]" and discount each circumstance individually, *R.W.*, 146 S. Ct. at 1072. "The totality-of-the-circumstances test . . . 'precludes this sort of divide-and-conquer analysis.'" *Id.* (quoting *Arvizu*, 534 U.S. at 274); *Hill v. Commonwealth*, 297 Va. 804, 815 (2019) (same).

Although the trial court here did not articulate the basis for denying McCumber's suppression motion, we "presume that the trial court made the requisite findings of fact to support its decision. And those findings of fact 'will not be disturbed unless plainly wrong or without evidence to support [them].'" *Commonwealth v. Holland*, 304 Va. 34, 47 (2025) (alteration in original) (quoting *Jones v. Commonwealth*, 29 Va. App. 503, 512 (1999)). "We also presume—even in the absence of specific factual findings—that the trial court resolved all factual ambiguities or inconsistencies in the evidence in favor of the prevailing party and gave that party the benefit of all reasonably debatable inferences from the evidence." *Id.* (quoting *Fitzgerald v. Commonwealth*, 223 Va. 615, 627-28 (1982)). *See also Hill*, 297 Va. at 808-09 (applying same standard when considering the trial court's denial of a suppression motion).

McCumber argues that his weaving twice within the traffic lane did not create reasonable suspicion of driving while intoxicated because two intra-lane weaves are far fewer than what we found sufficient in *Freeman v. Commonwealth*, 20 Va. App. 658 (1995), and *Neal v.*

- 5 -

*Commonwealth*, 27 Va. App. 233 (1998). After surveying caselaw from other jurisdictions, we held in *Freeman* that "weaving within a traffic lane or travelling at an inordinately slow rate of speed under the circumstances is sufficient to justify an investigatory stop." 20 Va. App. at 661 (collecting cases). Freeman weaved "three to four times within [his] lane of travel" and was driving "ten to fifteen miles per hour" under the 55 mile-per-hour speed limit. *Id.* at 659. Those facts sufficed for reasonable suspicion that Freeman was driving while intoxicated. *Id.* at 661-62.

In *Neal*, after again surveying other jurisdictions, we "agree[d] with our sister states that weaving within a single traffic lane is an articulable fact [that] may give rise to a reasonable suspicion of illegal activity." 27 Va. App. at 238-39 (collecting cases). We cautioned that "[a]n isolated instance of *mild weaving* within a lane is not sufficiently erratic to justify an investigatory stop." *Id.* (emphasis added). Still, we found reasonable suspicion that Neal was driving while intoxicated because he was "weaving inside of his lane, between five and ten times." *Id.* at 236. We "h[e]ld that repeated weaving in one's own lane gave the officer reasonable and articulable suspicion to stop the vehicle and investigate further." *Id.* at 239. We also noted that "[t]he record provided uncontested evidence of the officer's experience with intoxicated drivers." *Id.* at 239 n.3.

Nothing in *Freeman* or *Neal* suggested a minimum number of weaves or swerves that a driver must commit before an officer has reasonable suspicion to detain him on suspicion of driving while intoxicated. Rather, "[t]he test is one of reasonableness under 'the totality of the circumstances.'" *Neal*, 27 Va. App. at 239 (quoting *Freeman*, 20 Va. App. at 661). Those circumstances "includ[e] the officer's knowledge, training, and experience." *Id.* at 237 (quoting *Freeman*, 20 Va. App. at 661).

Our sister states have likewise rejected a bright-line rule as inconsistent with the totality-of-circumstances test. *See, e.g.*, *People v. Johnston*, 440 P.3d 1223, 1226 (Colo. App. 2018); *State v. Otto*, 566 N.W.2d 509, 511 (Iowa 1997) (per curiam); *State v. Pratt*, 932 A.2d 1039, 1041-42 (Vt. 2007); *State v. Post*, 733 N.W.2d 634, 641 (Wis. 2007). Wisconsin's highest court said it well:

> [W]e adopt neither the bright-line rule proffered by the State that weaving within a single lane may alone give rise to reasonable suspicion, nor the bright-line rule advocated by [the defendant] that weaving within a single lane must be erratic, unsafe, or illegal to give rise to reasonable suspicion. Rather, we maintain the well-established principle that reviewing courts must determine whether there was reasonable suspicion for an investigative stop based on the totality of the circumstances.

*Post*, 733 N.W.2d at 641.

Determining the reasonableness of an investigative detention from the totality of circumstances "is a common[-]sense test." *Id.* at 638. As a matter of common sense, an "isolated instance of mild weaving" alone is not enough. *Neal*, 27 Va. App. at 239. "Indeed, if failure to follow a perfect vector down the highway or keeping one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy." *United States v. Lyons*, 7 F.3d 973, 976 (10th Cir. 1993), *overruled in part on other grounds by United States v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995). But repeated or abrupt weaving reasonably suggests impaired driving. "Weaving within a lane is a widely recognized characteristic of an intoxicated driver," something "within the ability of most fellow drivers" to identify. *Arburn v. Dep't of Motor Vehicles*, 61 Cal. Rptr. 3d 15, 18 (Cal. Ct. App. 2007).

Thus, courts in other jurisdictions have found two intra-lane weaves sufficient for reasonable suspicion when combined with other circumstances to suggest driving while intoxicated, or when the weaves were unusual and not readily explained by road conditions or

weather.  *See, e.g.*, *United States v. Gibbs*, 547 F. App'x 174, 179-80 (4th Cir. 2013) (per curiam) (finding that two instances of "drift[ing] slowly toward the double yellow lines before quickly 'recorrecting' the vehicle to the center of the lane . . . . could not be excused on account of either poor road or poor weather conditions"); *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 (6th Cir. 2004) (finding reasonable suspicion where the defendant "weaved twice to the left to touch the dividing line in a fairly short span"); *Amundsen v. Jones*, 533 F.3d 1192, 1199 (10th Cir. 2008) ("We have . . . held that drifting onto the shoulder twice creates reasonable suspicion of driving under the influence."); *People v. Greco*, 783 N.E.2d 201, 206 (Ill. App. Ct. 2003) (defendant "swerved two or three times from the center of the road towards the curb"); *Robinson v. State*, 5 N.E.3d 362, 368 (Ind. 2014) (defendant "swerved *twice* on a relatively straight, flat roadway"); *State v. Thomte*, 413 N.W.2d 916, 917, 919 (Neb. 1987) (defendant's "vehicle twice weav[ed] within its lane of traffic," including one "sharp weave").  In *Robinson*, for instance, the Indiana Supreme Court explained that although the defendant's two swerves within the traffic lane "could have been attributable to driver distraction or some other more innocuous cause, *Terry* does not require absolute certainty of illegal activity, but rather reasonable suspicion." *Robinson*, 5 N.E.3d at 368.

McCumber relies principally on our unpublished decision in *Commonwealth v. Augustus*, No. 1603-15-1, 2016 Va. App. LEXIS 76 (Mar. 11, 2016), where the panel affirmed the suppression ruling, but *Augustus* is both factually distinguishable and a good example of the totality-of-the-circumstances test in action.[1]  The police officers there tailed a truck driver after observing him engage in a suspected drug transaction.  Unlike in this case, the Commonwealth did not assert that the stop was warranted by the driver's "suspected impaired driving." *Id.*, slip

---

[1] Our unpublished opinions "will not be received as binding authority" but may be cited and considered for their persuasive value.  Rule 5A:1(f).

op. at 8, 2016 Va. App. LEXIS 76, at *12. The Commonwealth advanced other theories instead, but the trial court and this Court found none of them meritorious. One theory was that the driver had engaged in reckless driving because, after the officers turned on their emergency lights, the driver did not pull over immediately, "sped up a little, but stayed under the posted speed limit," and "weaved several times within [the] lane." *Id.*, slip op. at 3, 2016 Va. App. LEXIS 76, at *4. The trial court was unpersuaded, noting that the defendant's large truck "filled up the entire lane almost," the driver's actions "were not 'outlandish[,]' the weaving was the extent of any sort of traffic violation[,] and [the] stop was based solely on the alleged drug transaction." *Id.*, slip op. at 3, 2016 Va. App. LEXIS 76, at *5. While the panel of this Court agreed that "[o]ngoing weaving within one's lane can provide reasonable suspicion to justify a stop," it said that the trial court reasonably "found that there was only an isolated instance of mild weaving within a traffic lane over a very short distance," so "law enforcement did not have reasonable suspicion of reckless driving to justify the stop." *Id.*, slip op. at 9, 2016 Va. App. LEXIS 76, at *13-14.

By contrast, the facts brought out at the suppression hearing here sufficed to create reasonable suspicion that McCumber was driving while intoxicated. To start, McCumber's truck weaved twice within the lane. And it was no "isolated instance of mild weaving," *Neal*, 27 Va. App. at 239, but a swerve that was both suspicious and repeated. McCumber drifted slowly to one side and then abruptly jerked back to stay in his lane. Nothing in the record suggests that those swerves could be explained by road or weather conditions; the swerves occurred along a "small flat straight stretch" where there was only a "very slight" bend.

In addition, McCumber was driving 5 miles an hour under the 35 mile-per-hour speed limit—a fact that could suggest an impaired driver doing his best to stay on the road. And McCumber's taillights were not illuminated, suggesting the possibility of an impaired driver who neglected to turn them on. True, the record does not tell us whether McCumber's headlights

were turned off or whether his taillights were just not working. But a reasonable officer in Young's position could properly suspect that an impaired driver had failed to turn on his lights.[2]

The trial court was also entitled to credit Young's training and experience in assessing whether McCumber's driving behavior established reasonable suspicion. *See Neal*, 27 Va. App. at 239 n.3 (citing "uncontested evidence of the officer's experience with intoxicated drivers"). Young had conducted "a couple hundred" traffic stops over his 11-year tenure as a law-enforcement officer. When asked what crime he "reasonably suspect[ed] was being committed" based on the conduct he observed, Young answered, "Driving under the influence of drugs or alcohol." The trial court could properly rely on Young's experience to recognize that McCumber's behavior established reasonable suspicion that McCumber was driving under the influence of drugs or alcohol.

McCumber posits a series of "innocent explanations" that could account for his behavior and negate the inference that he swerved because he was intoxicated:

- "Mr. McCumber could have been swerving for trash that perhaps was too insignificant for the officer to notice."

- "Mr. McCumber could have been trying to prohibit his irascible dog from eating the groceries he was taking home."

- "Maybe Mr. McCumber accidentally spilled hot coffee on himself."

McCumber Br. 10. Maybe so. There could also be innocent explanations for why McCumber was driving five miles per hour under the speed limit and for why his taillights were not on.

But that misapprehends the "reasonable suspicion" standard. "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*,

---

[2] "In conducting a *Terry* stop, the police must diligently pursue a means of investigation likely to confirm or dispel their suspicions quickly." *Brown v. Commonwealth*, 33 Va. App. 296, 307 (2000). Young did so here, detecting alcohol on McCumber's breath as soon as he approached the driver's side door.

- 10 -

534 U.S. at 277. "To the contrary, 'the principal function of [the] investigation is to resolve that very ambiguity . . . to "enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges."'" *Turay v. Commonwealth*, 79 Va. App. 286, 298 (2023) (en banc) (alterations in original) (quoting *Morris v. City of Virginia Beach*, 58 Va. App. 173, 183 (2011)). "Undoubtedly, each of these factors alone is susceptible to innocent explanation, and some factors are more probative than others. Taken together, [however] . . . they sufficed to form a particularized and objective basis for [the officer's] stopping the vehicle, making the stop reasonable within the meaning of the Fourth Amendment." *Arvizu*, 534 U.S. at 277-78.

> *B. The stop did not violate Code § 46.2-1030(F) because McCumber was not detained for violating that statute.*

McCumber argues, as he did below, that the stop here was fatally tainted because Young cited as one of the reasons for pulling him over that his taillights were not illuminated. Subsection A(i) of Code § 46.2-1030 requires that illuminating devices be lighted "from sunset to sunrise." But subsection F imposes an exclusionary rule for "evidence discovered or obtained as the result of a stop in violation of this subsection," except that "a law-enforcement officer may stop a vehicle if it displays no lighted headlights during the time periods set forth in subsection A." That code section was one of 19 statutes that the General Assembly amended in 2020 to prevent pretextual traffic stops based on what the General Assembly determined were comparatively minor traffic offenses. *See Smith v. Commonwealth*, 78 Va. App. 371, 380-81 & n.3 (2023). The amendment created "a statutory 'exclusionary rule' that provide[s] broader protection for defendants than is required by the Fourth Amendment." *Id.* at 384.

We reject the Commonwealth's argument that the statutory exclusionary rule in Code § 46.2-1030(F) does not apply to taillight violations. The Commonwealth maintains that the statute refers only to "headlights and illuminating devices," while "tail lights" are governed

- 11 -

by Code § 46.2-1013.[3]  The Commonwealth argues that it was dicta when we said in *Flores v. Commonwealth*, 82 Va. App. 249, 260 (2024), that Code § 46.2-1030 required "tail lights" to be turned on from sunset to sunrise.  But Code § 46.2-1030(A) requires nighttime illumination not only of "headlights" but of "illuminating devices as required by this article," and the taillight requirement in Code § 46.2-1013 is part of the same "article."  Thus, taillights are among the "illuminating devices" covered by the nighttime illumination requirement in Code § 46.2-1030(A).

Even so, the statutory exclusionary rule does not apply here because Young did not stop McCumber "for a violation of" the illumination requirement.  Code § 46.2-1030(F).  We agree with McCumber that for such "secondary offenses" as this one, a suspect "may only be stopped and ticketed if the officer has other lawful reason to stop the vehicle."  McCumber Br. 11.  But as McCumber's counsel admitted in the trial court, "Young didn't stop [McCumber] for a violation of" Code § 46.2-1030.  Young stopped him because he suspected that McCumber was "[d]riving under the influence of drugs or alcohol" in violation of Code § 18.2-266.  In other words, the fact that the taillights were not illuminated was not "a 'legal pretext to stop the [vehicle].'"  *Smith*, 78 Va. App. at 384 (quoting *Thomas v. Commonwealth*, 57 Va. App. 267, 274 (2010)).  It was simply one among the totality of circumstances that created reasonable suspicion that McCumber was driving while intoxicated.

---

[3] The Code uses inconsistent terms to refer to the red lights mounted on the rear of a vehicle.  Some provisions like Code § 46.2-1013 refer to "tail lights."  *See, e.g.*, Code §§ 46.2-1012, -1088.5, -1150.  Others refer to "taillights."  *See, e.g.*, Code §§ 46.2-1008, -1029.2, -1036.  Unless quoting a statute, we use *taillights*, which is now the more common usage.  *See, e.g.*, *Taillight*, *Webster's Third New Int'l Dictionary Unabridged* (2021).

CONCLUSION

In sum, we find that McCumber's weaving and driving below the speed limit at night without his taillights on established reasonable suspicion to justify the traffic stop. So the trial court did not err in denying McCumber's motion to suppress.

*Affirmed.*

Causey, J., concurring in part and dissenting in part.

I concur with the majority's holding that the exclusionary rule in Code § 46.2-1030(F) covers non-ignited taillights. However, I respectfully dissent from the judgment for two reasons: First, I would hold that in Code § 46.2-1030(F), the General Assembly intended to prohibit a lack of illuminated taillights from serving as a predicate—even in part—for reasonable suspicion to stop a vehicle. Second, I would hold that the police lacked reasonable articulable suspicion to stop McCumber's vehicle on the basis of two in-lane swerves that occurred in quick succession and were followed by a short period of slow driving. Therefore, I would hold that the trial court erred in denying the motion to suppress.

## I. McCumber's Defective Taillights Should Not Be Considered as Part of the Reasonable Suspicion Analysis

First, I would hold that under Code § 46.2-1030(F), a driver's non-ignited taillights cannot serve as any portion of the justification considered by a court in support of the legality of a traffic stop. Therefore, I would limit the reasonable suspicion analysis to McCumber's brief in-lane swerving and driving under the speed limit.

As the majority rightly recognizes, our legislature recently passed a rule prohibiting vehicle stops for non-ignited taillights. Code § 46.2-1030(A) requires vehicles to "display lighted headlights and illuminating devices" during certain periods, including "from sunset to sunrise." Code § 46.2-1030(F) then states that "[n]o law-enforcement officer may stop a vehicle for a violation of this section, except that a law-enforcement officer may stop a vehicle if it displays no lighted *headlights*" during the relevant period. (Emphasis added). Therefore, a vehicle may *not* be stopped "for" non-ignited *taillights*—another form of illuminating device.[1]

---

[1] If the legislature wanted for lighted taillights to also be a factor that law enforcement officers could weigh when deciding to initiate a traffic stop, the General Assembly easily could have included the words "illuminating devices" in Code § 46.2-1030(F)—as it did in Code § 46.2-1030(A). We must assume that the General Assembly made a deliberate decision to only

14

*Id.* And, under that code section, "[n]o evidence discovered or obtained as the result of" such an unlawful stop "shall be admissible." *Id.* I join in the majority's reasoning rejecting the Commonwealth's arguments to the contrary.

Unlike the majority, however, I would further interpret the General Assembly's prohibition on "stop[ping] a vehicle for a violation of" the ignited-taillight requirement to indicate the following rule: non-ignited taillights may not serve as a necessary portion of the legal justification for any stop.

First, I would note that the majority does *not* appear to suggest that non-ignited taillights, in isolation, could legally constitute the *sole* reasonable suspicion undergirding a stop for suspected DUI. In other words, an officer cannot observe a vehicle driving with non-ignited taillights, become "suspicious" that the driver failed to remedy that issue because he was intoxicated, and conduct a stop on that basis. Putting aside the clear unconstitutionality of this kind of stop,[2] construing that situation to comply with Code § 46.2-1030(F) would negate the unambiguous legislative intent: to shield members of the public from seizures based on non-ignited taillights. *See McFadden v. McNorton*, 193 Va. 455, 461 (1952) ("[A] statute ought to be interpreted in such manner that it may have effect, and not to be found vain and elusive."). Again, I do not believe that such an interpretation is advanced by the majority in this case.

I do also believe, however, that the majority's position creates similar problems. Under the majority's reading, all that would seem to be necessary to comply with Code § 46.2-1030(F),

_____

include the word "headlights" in Code § 46.2-1030(A). *City of Richmond v. VEPCO*, 292 Va. 70, 75 (2016) ("[Courts] assume that the General Assembly chose, with care, the words it used . . . ." (alteration in original) (citation omitted)).

[2] *See Navarette v. California,* 572 U.S. 393, 402 (2014) ("Of course, not all traffic infractions imply intoxication. Unconfirmed reports of driving without a seatbelt or slightly over the speed limit, for example, are *so tenuously connected* to drunk driving that a stop on those grounds alone would be *constitutionally suspect*." (emphases added)).

is for a police officer to testify that a given traffic stop was not based *solely* on a defendant's taillights. It is troubling that a factor that the legislature has taken pains to identify as an illicit basis for a stop could serve as a significant part of a "mixed-motives" stop. *See Almond v. Gilmer*, 188 Va. 1, 49 (1948) ("It must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts."). On a practical level, in my view, permitting such stops simply due to the coexistence of *some other* non-taillight criteria, no matter how small,[3] risks undercutting the General Assembly's clearly expressed will. *See McFadden*, 193 Va. at 461.

In my view, the most natural interpretation of the plain language does not create this issue. The best reading of the language, I would argue, is that the General Assembly has completely excised defective taillights from the reasonable suspicion analysis.

I would argue that the word, "for" in Code § 46.2-1030(F) should be construed to convey a causal meaning; the sentence could be reframed as, "No law-enforcement officer may stop a vehicle" *because of* "a violation of" the taillight requirement. In other words, the General Assembly has identified defective taillights as an impermissible basis for a traffic stop. As our case law in another context helps illustrate, when the legislature has spoken by identifying a particular criterion as an illicit basis for a decision, we must ordinarily interpret that term to mean that a decision cannot be based on that factor *at all*.

Our Supreme Court has explicitly held that in the absence of language creating a "sole causation" requirement, a prohibition on performing a specific act for an improper purpose, means that actions also may not be performed even *partly* for that purpose. *Shaw v. Titan Corp.*, 255 Va. 535, 543 (1998). In *Shaw*, the Supreme Court distinguished the causation standard

---

[3] For example, what is to prevent an officer from observing non-ignited taillights and then following the driver until he, inevitably, exhibits a mild aberration like weaving within his lane of travel? *See infra* § II (discussion of the ubiquity of in-lane weaving).

16

applicable in wrongful termination case law using the term "*because*" from the standard stated in case law interpreting a code section that used the words "*solely* because." *Id.* at 542-43 (second emphasis added) (first quoting *Lockhart v. Commonwealth Educ. Sys. Corp.*, 247 Va. 98, 106 (1994); and then quoting Code § 65.2-308(A)). In the absence of the term "solely" in the common law's precedential standard, the Court held, a termination may be wrongful even if the improper purpose is not its *sole* cause or purpose. *Id.* at 543.

Similarly, under federal law, many consequential decisions—such as those relating to employment and housing—cannot be made on the basis of (i.e., "because of" or "for") a person's membership in a protected class. *See, e.g.*, 42 U.S.C. § 2000e-2(a)(1) (stating in part that "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire . . . any individual . . . *because of* such individual's race, color, religion, sex, or national origin" (emphasis added)). Under controlling precedent, this means that a decision made even *partly* on that basis is illicit. *See, e.g.*, *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) ("For status-based discrimination claims, the [claimant] must 'show that the motive to discriminate was *one of* the [defendant's] motives, even if the [defendant] also had other, lawful motives that were causative in the [defendant's] decision.'"). Even under the standard of "but-for causation," the strictest federal civil rights causation standard, an illicit factor may not play any *necessary* part in a decision. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). Further, this same interpretation is standard across the nation outside the realm of anti-discrimination law. *See, e.g.*, *Hillview Assocs. v. Bloomquist*, 440 N.W.2d 867, 871 (Iowa 1989) (interpreting a prohibition on landlord retaliation against tenants to apply in cases when retaliation was not the sole motive for an action); *Wright v. Brady*, 889 P.2d 105, 109 (Idaho Ct. App. 1995) (same); *Elk Creek Mgmt. Co. v. Gilbert*, 303 P.3d 929, 940 (Or. 2013) (same).

The language at play in Code § 46.2-1030 lends itself to interpretation along the lines of *Shaw*. The legislature did not add limiting language to convey that it was only prohibiting stops performed "*solely* for a violation of" the taillight requirement. Instead, it more broadly and straightforwardly said that no stop may be performed "*for* a violation of" that requirement. Code § 46.2-1030(F) (emphasis added). The most natural interpretation of that language is that the legislature intended to prohibit this factor from being any necessary part of the legal basis of a stop. *See Shaw*, 255 Va. at 542-43. It rendered impermissible *not only* stops based *solely* on malfunctioning taillights, but also stops depending *in part* on the basis of malfunctioning taillights. *Id.*

Under the more stringent but-for causation standard, the language in Code § 46.2-1030(F) means that a stop is barred if there is no independently sufficient constitutional basis for it, aside from the non-ignited taillights. In other words, a stop is prohibited if an observation of non-ignited taillights was a necessary part of the totality of the circumstances that would (in the absence of the statute) support a finding of reasonable suspicion. Stops will then truly be prohibited from occurring "for" violations of the lighted taillight requirement.[4] Code

---

[4] The majority quotes McCumber's counsel's statement that the police officer "didn't stop him for a violation of [Code § 46.2-1030]." This statement was *not* a concession that the exclusionary rule was inapplicable to this case; to the contrary, it was an argument about pretext.

    As is clear from the surrounding context, the above statement was made in support of McCumber's counsel's argument that the police brought up the taillight issue as a post-hoc rationalization for an otherwise-unconstitutional stop. McCumber's counsel followed the statement by adding,

> [The officer] had absolutely no intent of stopping him for any kind of defective equipment in violation[.] . . . [T]hat is all merely a pretext for a constitutional violation against my client's rights simply because they've looked at the case law and discovered that I'm right, that you cannot stop a vehicle for swerving twice within the lines.

    McCumber's point is that the exclusionary rule in Code § 46.2-1030(F) *not only* precludes taillight issues from serving as any part as the *actual* justification employed by an

18

§ 46.2-1030(F).  *See Shaw*, 255 Va. at 543; *McDonnell Douglas*, 411 U.S. at 802-03; *Guessous*; 828 F.3d at 216; *Elk Creek Mgmt. Co.*, 303 P.3d at 940.

In sum, I would interpret Code § 46.2-1030(F) to create a causal inquiry, barring stops that depend on an illicit factor for their constitutionality.  This interpretation, in my view, is the best reading of the plain language of the statute and underlying legislative intent.

## II.  The Police Lacked Reasonable Suspicion to Stop McCumber

As part of its prohibition on unreasonable searches and seizures, the Fourth Amendment bars any police officer from performing even a "brief investigative traffic stop" of an automobile unless he possesses "reasonable suspicion" that the person stopped is engaged in criminal activity.  *Kansas v. Glover*, 589 U.S. 376, 380 (2020).  This requirement of "reasonable, articulable suspicion that criminal activity is afoot," *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)), is assessed from the perspective of a reasonable officer, viewing the facts "through the lens of his police experience and expertise," *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

Viewing the facts through this lens, courts look for *objective* justifications for a stop.  The Fourth Amendment requires "a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *Navarette v. California*, 572 U.S. 393, 396 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417-418 (1981)).  At the other end of the spectrum, "an 'inchoate and unparticularized suspicion or "hunch" of criminal activity'" will not pass constitutional muster.  *Wardlow*, 528 U.S. at 124 (quoting *Terry*, 392 U.S. at 27).  *See Hill v. Commonwealth*, 297 Va. 804, 827 (2019) ("[D]ue weight must be given, not to his inchoate and

---

officer for a stop—but it *also* prohibits taillights from functioning as an alternative justification grafted by the Court onto an otherwise-unconstitutional stop.  Here, we need not determine whether McCumber's defective taillights was an actual justification or post-hoc rationalization.  Either way, it cannot serve as any part of the Commonwealth's case for reasonable suspicion.

19

unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." (quoting *Whitaker v. Commonwealth*, 279 Va. 268, 274 (2010))). These minimum requirements for reasonable suspicion are strictly upheld; they "safeguard[] the privacy and security of individuals against arbitrary invasions by governmental officials." *Brown v. Commonwealth*, 270 Va. 414, 418 (2005).

The policing of drivers traversing the Commonwealth's roads can present a thorny reasonable suspicion issue. On the one hand, if an officer actually perceives a driver committing a traffic infraction, that person, of course, may generally be stopped.[5] But when legal[6] driving is observed by police, many minor indicia that a police officer may consider possible indications that a driver might be intoxicated—undoubtedly a critical safety issue—are equally consistent with lawful, sober drivers encountering brief obstacles or distractions. *State v. Smith*, 21 S.W.3d 251, 258 (Tenn. Crim. App. 1999) ("Only the hypothetical 'perfect driver' would not be subject to seizure if we were to hold that minor driving 'errors,' which neither violate our traffic code nor create a hazard, indicate that a person might be intoxicated."). Thus, while driving that reaches a certain level of recklessness will certainly merit a stop, careful scrutiny must be applied to reasonable suspicion analyses based on intrinsically lawful behavior to ensure that everyday citizens are not subject to the prospect of constant temporary seizures. *See Harris v. Commonwealth*, 276 Va. 689, 697 (2008) ("Lawful conduct that the officer may subjectively

---

[5] As noted *supra*, this rule is subject to numerous exceptions, such as that stated in Code § 46.2-1030(F).

[6] Consistently in our case law, special scrutiny is applied to seizures performed on the basis of lawful but ostensibly concerning behavior. *See Brown*, 270 Va. at 420-21 (noting our Supreme Court "has consistently declined to find that probable cause can be established solely on the observation of material which can be used for legitimate purposes, even though the experience of an officer indicates that such material is often used for illegitimate purposes").

view as unusual is insufficient to generate a reasonable suspicion that the individual is involved in criminal activity."); *Brown*, 270 Va. at 418.

As particularly relevant to this case, several jurisdictions have made the commonsense[7] observation that brief, occasional periods of weaving or swerving in a lane are a ubiquitous occurrence for law-abiding drivers. *See State v. Tague*, 676 N.W.2d 197, 205 (Iowa 2004) (noting that "any vehicle could . . . briefly cross[] an edge line of a divided roadway," as this "happens all too often" and might be due to "[d]rivers talking on their cell phone, looking at a map, adjusting the radio, adjusting the heater, defroster or air conditioner, or checking on a child restrained in the back seat"). Permitting these minor aberrations to serve as a predicate for a stop would, as noted, permit a great many law-abiding drivers to be subject to seizure by police officers—a type of "governmental invasion[]"—on a nearly everyday basis. *Brown*, 270 Va. at 418; *see also United States v. Lyons,* 7 F.3d 973, 976 (10th Cir. 1993) ("Indeed, if failure to follow a perfect vector down the highway or keeping one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy."), *overruled on other grounds by United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc).

For these reasons, it is necessary to draw a careful distinction between weaving that can and cannot suffice for a finding of reasonable suspicion. In Virginia, the precedent of *Neal v. Commonwealth*, 27 Va. App. 233 (1998), discussed below, supports drawing the line pursuant to the above observations: to establish reasonable suspicion, a driver's brief, in-lane weaving must exceed that which is equally consistent with the driver possibly encountering an obstacle or

---

[7] *See Glover*, 589 U.S. at 380-81 (noting that the reasonable suspicion analysis depends on officers' "commonsense judgments and inferences about human behavior").

ordinary distraction. *See Tague*, 676 N.W.2d at 205; *Smith*, 21 S.W.3d at 258; *Lyons,* 7 F.3d at 976.

In *Neal,* this Court held that the facts of the case at hand sufficed for reasonable suspicion, as the vehicle "weav[ed] inside of [its] lane . . . between *five and ten times*." 27 Va. App. at 236 (emphasis added). But even in upholding Neal's conviction, the Court also took pains to explicitly caution Virginia courts: "An isolated instance of mild weaving within a lane *is not* sufficiently erratic to justify an investigatory stop." *Id.* at 239 (emphasis added) (citing *United States v. Gregory*, 79 F.3d 973 (10th Cir. 1996)). The *Neal* Court used clear prohibitory language ("*is not* sufficiently erratic to justify"). Thus, if this Court concludes that McCumber's driving constituted an "isolated instance of mild weaving within a lane," then we have no discretion and must reverse the denial of the motion to suppress.

I would conclude that in this case, as a primary matter, the prohibitory rule in *Neal* controls: McCumber's actions merely constituted an "isolated instance of mild weaving within a lane." *Id.* The weaving should be considered "isolated" because it occurred over a very short period and did not recur thereafter. McCumber's weaving occurred in two back and forth movements that happened in quick succession and that lasted roughly five seconds each. After this instance of swerving, McCumber proceeded on his route and did not weave any more until he was pulled over.

The majority appears to suggest that "isolated" in *Neal* means that the prohibitory rule applies only to drivers who perform one "weave," or one singular discrete back-and-forth movement. I disagree with this interpretation. *Neal* uses the word "weaving" rather than "weaves." This word choice indicates that an "isolated . . . instance of weaving" could cover multiple repeated back and forth movements. *See Weaving*, *Webster's Third New International Dictionary* (1981) ("[T]he action of a vehicle that *alternately* diverges from and merges into

22

traffic flows moving in the same direction, shifting from one lane to another, and *repeatedly* crossing the paths of other vehicles" (emphases added)).  The term "isolated instance," as applied to the term "weaving," is best read to require that the alternate back-and-forth movements happen together and in quick succession—as opposed to stopping completely and then recurring after a period of cessation.  *See Commonwealth v. Augustus*, No. 1603-15-1, slip op. at 3, 9, 2016 Va. App. LEXIS 76, at \*4, \*14 (Mar. 11, 2016) (affirming lower court's suppression order in part due to circuit court's finding that a driver who "weaved *several times* within [the] lane" had merely engaged in an "*isolated instance* of mild weaving within a traffic lane over a very short distance" (emphases added)).

The majority also indicates that McCumber's driving cannot qualify for the per se rule because his weaving was not "mild."  This argument may present a closer question, as the officer described two "abrupt" movements.  However, in my view, the weaving in question should still be considered "minor."  McCumber never once crossed over the center line of the road, nor onto the rumble strip on the right side of the road.  He weaved only for a few seconds each time.  While abruptness may be considered as part of the analysis, I view the brevity and minimal movement involved in the weaving as sufficient to qualify for *Neal*'s absolute prohibitory rule.  Had McCumber crossed any lines on the road, perhaps the outcome would differ.

However, even if the weaving did not qualify as "mild" under *Neal*'s absolute prohibitory rule, I would still hold that, under the principles of *Neal*, McCumber's weaving was insufficient to support a finding of reasonable suspicion under the totality of the circumstances.

The *Neal* Court, in articulating its "isolated instance of mild weaving within a lane" caveat, did not purport to set a *ceiling* for the degree of weaving that can be insufficient to show reasonable suspicion.  27 Va. App. at 239.  Rather, through the use of clear prohibitory language ("*is not* sufficiently erratic to justify"), it explicitly only set a bright-line rule *prohibiting* this

23

Court from upholding a traffic stop when its weaving-related justification is below a specific level. To determine what *Neal* has to say about cases beyond this minimum threshold, we should look to its underlying principles.

The broader principle underlying the brief but forceful caveat in *Neal* can be seen in the primary case it cites in support of that rule: *United States v. Gregory*, a Tenth Circuit opinion. In *Gregory*, a driver was stopped after briefly crossing "two feet into the right shoulder emergency lane of the interstate" on a windy day. 79 F.3d at 975-76. The *Gregory* Court reasoned that this movement was *insufficient* to justify a stop precisely because it was the kind of brief weaving that is ubiquitous for ordinary drivers. *See id.* at 978-79 ("As we have stated, '[I]f failure to follow a perfect vector down the highway or keeping one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy.'" (alteration in original) (quoting *Lyons*, 7 F.3d at 976)).

The *Neal* Court reaffirmed that—outside of the above-discussed realm of strict prohibition on stops for "isolated instance[s] of mild weaving"—"[t]he test is one of reasonableness under 'the totality of the circumstances.'" 27 Va. App. at 239 (quoting *Freeman v. Commonwealth*, 20 Va. App. 658, 661 (1995)). In performing this assessment, courts interpreting *Neal* should be guided by the principle discussed in *Gregory*, as well as the other cases discussed above: that while constant or continual weaving over a significant period may suffice for reasonable suspicion, drivers should not be stopped for minor, in-lane aberrations consistent with temporary distractions or obstacles. *See Tague*, 676 N.W.2d at 205; *Smith*, 21 S.W.3d at 258; *Lyons*, 7 F.3d at 976.

In this case, under the totality of the circumstances, McCumber's driving did not rise to the level of "reasonable, articulable suspicion" because his brief in-lane weaving was consistent

24

with a possible response to any number of ordinary, legal occurrences that happen to drivers on an everyday basis. A driver exhibiting McCumber's level of brief, mild weaving may have been avoiding small animals on the road—and the police officer acknowledged such animals were often out at night in the area. He could have been changing the radio station or fumbling for a necessary item in the cupholder. He could have been distracted by a child passenger's urgent whining. In any case, McCumber's movements on the road, while imperfect, were brief and mild enough that they did not provide grounds for a restriction of his liberty via a temporary stop.

Before concluding, I will note that while the majority provides a list of out-of-jurisdiction decisions that appear to support a finding of reasonable suspicion on similar facts, there are also numerous courts who have come to the opposite conclusion in similar situations. *See State v. Fields*, 673 S.E.2d 765, 766 (N.C. Ct. App. 2009) (holding lower court erred in finding reasonable suspicion where "[o]n three separate occasions, [a police officer] saw defendant's car swerve to the white line on the right side of the traffic lane" over the course of "approximately one and a half miles"); *United States v. Jimenez-Medina*, 173 F.3d 752, 754 (9th Cir. 1999) (finding district court erred in finding reasonable suspicion where a police officer observed a pickup truck "weave within its lane" while driving in an area in which pickup trucks were known to be used for smuggling undocumented immigrants across the border, while driving 45-50 miles per hour in a 75-mile-per-hour zone); *State v. Dexter*, No. 1-622, 2011 Iowa App. LEXIS 915, at *1, *7-8 (Iowa Ct. App. 2011) (holding lower court erred in finding reasonable suspicion where an officer observed a vehicle "weav[ing] slowly and gently from right to left" four or five times, and once "hugg[ing] the center and fog lines," while driving at 2:39 a.m.); *State v. Post*, 733 N.W.2d 634, 639 (Wis. 2007) (noting that "movements that may be characterized as 'repeated weaving within a single lane' may, under the totality of the circumstances, fail to give rise to

25

reasonable suspicion," including, "for example, where the 'weaving' is minimal or happens very few times over a great distance"). I would argue that this battle of out-of-state case law shows that the best result will be reached on the basis of applying the underlying principles I have advocated for above rather than trying to match facts perfectly with out-of-jurisdiction cases.

Further, it bears noting that the driving behaviors noted by the U.S. Supreme Court as examples of indicia of driving while intoxicated are orders of magnitude more severe than what was observed in this case. The Supreme Court provided the following string citation as exemplifying "sound indicia of drunk driving":

> *See, e.g.*, *People v. Wells*, 38 Cal. 4th 1078, 1081, 45 Cal. Rptr. 3d 8, 136 P. 3d 810, 811 (2006) ("'weaving all over the roadway'"); *State v. Prendergast*, 103 Haw. 451, 452-453, 83 P. 3d 714, 715-716 (2004) ("cross[ing] over the center line" on a highway and "almost caus[ing] several head-on collisions"); *State v. Golotta*, 178 N.J. 205, 209, 837 A. 2d 359, 361 (2003) (driving "'all over the road'" and "'weaving back and forth'"); *State v. Walshire*, 634 N.W. 2d 625, 626 (Iowa 2001) ("driving in the median").

*Navarette*, 572 U.S. at 402.

Finally, I will note that the slow speed observed by the police officer in this case was very mild. Traveling five miles per hour below a 35 mile-per-hour speed limit is hardly a striking occurrence. While speed—and perhaps even slow speed—is a factor that can be considered as a meaningful part of the totality of the circumstances analysis in some reasonable suspicion cases, I would hold that the slow driving in this case did not suffice to move the needle to the point of creating "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 396.

III. *Conclusion*

I would first hold that under Code § 46.2-1030(F), McCumber's non-ignited taillights could play no part in supporting a finding of reasonable suspicion for a stop in this case. Second, I would hold that under the totality of the circumstances, McCumber's in-lane weaving did not

suffice for a finding of reasonable suspicion to perform a temporary seizure under the Fourth Amendment. I would therefore reverse the circuit court's denial of McCumber's motion to suppress.